Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 14, 2010          Decided February 11, 2011

No. 09-5128

ANTOINE JONES,
APPELLANT

v.

NORMA HORNE, DETECTIVE - MPD, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01027)

---

*Michael N. Khalil*, appointed by the court, argued the cause as *amicus curiae* in support of appellant.  With him on the briefs was Anthony F. Shelley, appointed by the court.

*Antoine Jones*, appearing pro se, filed a brief.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellee Rachel C. Lieber.  With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant

U.S. Attorney.  *Kenneth A. Adebonojo*, Assistant U.S. Attorney, entered an appearance.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees Dennis Harrison and Norma Horne.  With her on the brief were *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: SENTELLE, *Chief Judge*, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Upon his arrest for federal drug offenses, Antoine Jones was confined pending trial at the Central Detention Facility (hereinafter "D.C. Jail").  When the U.S. Attorney's Office discovered that Jones might be a threat to various individuals, it sought to have him placed in protective custody.  When the prosecutor assigned to Jones' criminal case learned that Jones was continuing to make telephone calls, she instructed jail officials to place Jones "in lockdown until further notice."  Jones remained in "lockdown" from December 2, 2005, without mail or telephone or visitor privileges until April 26, 2006, when the district court ordered Jones returned to the general population at the D.C. Jail subject to certain restrictions on his mail, telephone, and visitor privileges.

Jones, acting *pro se*, sued the prosecutor, the acting warden of the D.C. Jail, and the detective from the Metropolitan Police Department who prepared an affidavit in support of a search warrant for his cell.  He alleged that they had violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The district

court dismissed the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted against the prosecutor and the acting warden; it dismissed the complaint against the detective as conceded when Jones did not respond to the detective's motion to dismiss. Jones appeals. For the following reasons, we affirm.

**I.**

The investigation by the Federal Bureau of Investigation ("FBI") and the events leading to Jones' arrest on October 24, 2005 and his indictment for drug conspiracy and related offenses are described in the case bearing the name of his codefendant, *United States v. Lawrence Maynard*, 615 F.3d 544 (D.C. Cir.), *rehearing en banc denied*, 625 F.3d 766 (2010). Following his commitment by a federal magistrate judge to the custody of the U.S. Attorney General pending trial, Jones was housed in the general population at the D.C. Jail following a screening by D.C. Corrections Department officials. On November 23, 2005 a search warrant for his cell was executed and various papers were seized, including lists of names and a letter identifying the location of an unindicted co-conspirator at the D.C. Jail. The detective's affidavit supporting the search warrant stated that Jones was apparently seeking to maintain a role in his drug-trafficking enterprise, based on the pre-arrest investigation and Jones' recorded telephone calls from the D.C. Jail seeking to contact Lawrence Maynard and get letters to him.

According to the complaint, the prosecutor assigned to Jones' criminal case (hereinafter "the prosecutor") "telephoned the DC[] Jail and verbally told the Administration to remove me from general population and place me in segregation under Total Separation (T.S.) Status . . . [and] not be allowed social visits, telephone calls and that my mail be withheld from me." Compl. at 1. Attached to the complaint were various documents,

including a December 22, 2005 memorandum from the prosecutor to the acting warden.[1] It recounted that the prosecutor, after learning that Jones was continuing to make telephone calls and was apparently still in the general population, sent a memorandum to the D.C. Jail on December 2, 2005 stating: "Antoine Jones, DCDC 24912 should [be] placed immediately in lockdown at the D.C. Jail. Please ensure that Mr. Jones is [in] lockdown until further notice." In the December 2, 2005 memorandum the prosecutor also advised the acting warden that she was renewing this request "to ensure the safety of various individuals, and the integrity of the investigation." Jones was removed from the general jail population on or about December 2, 2005 and placed in "Total Separation" status, with restricted telephone and mail privileges. In the December 22 memorandum, the prosecutor advised the acting warden that call logs showed Jones had continued to make telephone calls after he had in fact been placed in Total Separation status, which "undermine[d] the purpose of his being in that placement." Additionally, the prosecutor wrote: "Please consider this memorandum a formal request for an immediate investigation into this situation, to include an examination of how these clear violations occurred, and more importantly, an

---

[1] The attachments to Jones' complaint also included: the detective's affidavit stating that Jones was potentially attempting to run a narcotics trafficking operation from the D.C. Jail; the prosecutor's December 5, 2005 letter to Jones' defense counsel explaining that the U.S. Attorney's Office had learned that Jones "was attempting to identify witnesses against him and 'take care of them'"; and the U.S. Attorney's Office's response to a pretrial motion indicating that Jones was enlisting help "to try and locate[] a co-conspirator," and had listed both the names of "individuals Jones considered as potential witnesses" and "suspected cooperators."

immediate correction of the problem." Jones was thereafter denied any social visits, telephone and incoming mail privileges.

On February 26, 2006, defense counsel in Jones' criminal case filed a motion for modification of the conditions of Jones' pretrial detention. Jones' Housing Board hearing on December 15, 2005, and administrative housing grievances filed on January 20, 2006 and February 10, 2006, had provided no relief as he was informed by memorandum from the acting warden that the restrictions were imposed at the request of the U.S. Attorney's Office. In the motion, defense counsel argued that there had been improper interference with the attorney-client relationship and that the restrictions were punitive. The list seized from Jones' cell, according to defense counsel, had been prepared at defense counsel's request for a list of persons who may have information regarding Jones' criminal case; since the seizure defense counsel had told Jones not to write anything down. Defense counsel also argued that the restrictions were unnecessary to ensure the internal security at the D.C. Jail or to effect Jones' presence at trial, and further that the conditions of Jones' confinement did not appear to be reasonably related to a legitimate governmental objective, but "appear to be solely punitive in nature and thus violate [Jones'] due process rights." Motion for Modification of Detention Conditions at 2–3, *United States v. Jones*, No. 05-386 (D.D.C. Feb. 26, 2006), ECF No. 76.

The U.S. Attorney's Office opposed the motion, pointing, in part, to a telephone call in which Jones revealed to a girlfriend that he was attempting to locate a "coconspirator who had been incarcerated in early October on other charges but not yet indicted in [Jones'] case," and to a letter written from the girlfriend divulging the location of the co-conspirator in the D.C. Jail and reporting that another individual was "on the street." Government's Response to Defendant Jones' Motion for Modification of Conditions of Detention at 2, *United States*

*v. Jones*, No. 05-386 (D.D.C. Mar. 16, 2006), ECF No. 85. The U.S. Attorney's Office also pointed to a list of names recovered from Jones' cell that "appears to be a list of individuals Jones suspects are government witnesses." *Id.* at 1–2. In a subsequent filing, the U.S. Attorney's Office noted that Jones attempted to use his wife and a second girlfriend to contact Maynard who was at large. Additionally, the U.S. Attorney's Office mentioned housing Jones outside of the District of Columbia in Orange or Northern Neck, Virginia. *Id.* at 3. Defense counsel objected that moving Jones to such a distance would place an undue burden on defense counsel as well as Jones' friends and family, and would not alleviate the U.S. Attorney's Office's concern stemming from Jones' communications with persons in the community.

On April 24, 2006, the district court in the criminal case granted the motion to modify Jones' pretrial detention conditions "insofar as [Jones] should no longer be in total lockdown." To address the concern of the U.S. Attorneys' Office, the district court also ordered that Jones' telephone calls be recorded and his mail monitored (except for telephone calls and mail from his defense counsel and criminal investigator), and social visits be limited to his wife, defense counsel, and the criminal investigator. Order, *United States v. Jones*, No. 05-386 (D.D.C. Apr. 24, 2006), ECF No. 111.

On June 8, 2007, Jones, acting *pro se*, filed a complaint pursuant to 28 U.S.C. § 1983, alleging the violation of his constitutional rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.[2] The complaint alleged: (1) The

---

[2] Although section 1983 provides a right to action against a person acting under color of state law who subjects any citizen or causes any citizen to be subjected to deprivation of any right secured by the Constitution, 42 U.S.C. § 1983, it does not apply to officials

denial of his right properly to prepare his defense to the criminal charges, including being denied by a D.C. Jail case manager the right to telephone defense counsel and to have access to legal and writing materials. (2) The denial of his right to the free exercise of his religion while being held in Total Separation status. (3) The denial of due process by the prosecutor and the D.C. Corrections Department officials who "conspired and stripped" him of his pretrial detainee due process social visits, and telephone and mail privileges. Jones claimed emotional suffering as a result of losing ties with his family and business associates, and that the prosecutor's interference with his access to witnesses denied him the right to a fair trial. He also claimed that the interception, copying, and reading of his mail without a warrant violated his prison rights. (4) Subjection to a health hazard, while being housed in the S-1 Unit, as a result of human urine and feces on the bars and walls, rodent infestation, cold temperatures, and bright lights 24 hours a day. (5) Discrimination by the prosecutor and the D.C. Jail and other staff by being held in his cell 24 hours a day 4 days a week and 23 hours a day 3 days a week; outside his cell he was strip searched, handcuffed, in shackles and belly chain, and his cell was searched each time he left it. Jones claimed that the physical housing segregation and isolation as a result of being denied privileges, in addition to being "discriminated against, punished, violated, humiliated and degraded," and complained that his segregation status was "used as a pretext for punishment

---

acting under color of federal law, such as a federal prosecutor acting within the scope of her duties. An equivalent right has been recognized by the Supreme Court, however, for money damages against persons acting under color of federal law. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). We construe Jones' *pro se* complaint against the prosecutor as brought pursuant to *Bivens*.

[and] torture." Compl. at 1,6. He further claimed that "the Prosecutor(s) acted outside their realm of jurisdiction in instructing the DC[] Jail Administration to place [him] in the T[otal] S[egregation] status and the DC[] Jail Administration acted outside their realm of jurisdiction by carrying out such an order without a properly signed court order from the judge." Compl. at 7. Jones sought monetary damages of $1,000,000, the disbarment of the prosecutor, and the demotion or suspension of the responsible D.C. Jail officials.

The district court dismissed the complaint against the prosecutor pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Jones v. Lieber*, 606 F. Supp. 2d 53 (D.D.C. 2009). The district court also ruled that Jones' complaint failed to state a claim against the acting warden in either his official or individual capacity. *Jones v. Lieber*, 579 F. Supp. 2d 175 (D.D.C. 2008). The district court granted the detective's motion to dismiss as conceded when Jones did not respond. *See* Order (Jan. 3, 2008).

## II.

On appeal, Jones, aided by amicus,[3] contends that his *pro se* complaint stated plausible claims of unconstitutional punishment by the prosecutor and the acting warden in view of his lengthy solitary segregation and "other extreme measures" he suffered at the D.C. Jail. He maintains that the affirmative disabilities or restraints imposed upon him have historically or practically been regarded as punishment for prisoners in correctional facilities, citing *Sandin v. Conner*, 515 U.S. 472,

---

[3] Jones filed a *pro se* brief on appeal and also adopted the arguments presented by amicus. *See* Appellant's Br. 1. In this opinion we do not distinguish between their arguments.

485–86 (1995), and *Crosby-Bey v. District of Columbia*, 786 F.2d 1182, 1185 (D.C. Cir. 1986), and were imposed without consideration of whether less excessive means were available. In support of reversal, Jones emphasizes that he alleged both physical and emotional harms and that the district court failed to refer to the factors outlined in *Bell v. Wolfish*, 411 U.S. 520, 538–39 (1979), and *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), for determining whether a governmental act against a pretrial detainee is punitive.

This court reviews *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). To survive a motion to dismiss, the pleadings must "suggest a 'plausible' scenario" that "sho[ws] that the pleader is entitled to relief." *Atherton*, 567 F.3d at 681(quoting *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009)). In the Supreme Court's most recent reformulation, *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.* at 1949 (internal quotation marks and citations omitted).[4] A *pro se* complaint "must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted), but even it "must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'" *Atherton*, 567 F.3d at 681–82 (quoting *Iqbal*, 129 S. Ct. at 1950).

**A.**

The premise of Jones' complaint is that a government interest in preventing witness tampering falls outside the interest identified in *Bell v. Wolfish* as sufficient to deprive a pretrial detainee of due process protections, namely ensuring conditions necessary for internal security at the D.C. Jail and to effect his presence at trial, *see id.* at 536–37; *see also Brogsdale v. Barry*, 926 F.2d 1184, 1190 (D.C. Cir. 1991). Restraints aimed at more general government interests, he maintains, such as the prosecution's case against the detainee, can be accomplished only through a pre-deprivation judicial hearing in which the government demonstrates that its interest should override the individual liberty at stake. Even assuming there were valid reasons to worry about his ability to influence events outside of the D.C. Jail, Jones notes that there were "clearly less restrictive means to go about it," Amicus Br. at 19, pointing to record evidence that the U.S. Attorney's Office never investigated what

---

[4] Jones' reliance on *Conley v. Gibson*, 355 U.S. 41, 46 (1957), and its somewhat more lenient standard governing motions under Rule 12(b)(6), is misplaced. The Supreme Court abrogated the *Conley* formulation in *Bell Atlantic Corp. v. Twombly*, 555 U.S. 544, 562–63 (2007). *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *see also generally* Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*: A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L. REV. 1 (2010).

options were available and the district court's modification of the conditions of his confinement. Therefore, Jones contends that where the prosecutor seeks to deprive a pretrial detainee of liberty interests the deprivation is better examined under the analysis in *Sell v. United States*, 539 U.S. 166 (2003), which involved a government proposal forcibly to medicate a defendant in order to render him competent to stand trial. The Supreme Court held that the government was required to demonstrate to a court that its interests are important, the liberty deprivation will significantly further those interests, the deprivation is necessary to further those interests and an alternative less intrusive action is unlikely to achieve substantially the same result, and the administration of drugs is in the patient's best medical interest in light of his medical condition. *Id.* at 180–81. Under this analysis, Jones maintains, the deprivations imposed by the prosecutor and the acting warden violated due process and the district court erred in dismissing his claims against them.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The protection extends "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal citation and quotation marks omitted). It is immunity from suit rather than a mere defense to liability. *Id.* It is applicable "unless the official's conduct violated a clearly established constitutional right." *Id.* at 816.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government

officials' qualified immunity claims.  A court must first decide whether the facts alleged by a plaintiff make out a violation of a constitutional right.  *Id.* at 201.  If so, the court must then decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.*  In *Pearson*, the Supreme Court overruled *Saucier* and held that lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  129 S. Ct. at 818.  We turn first to the question whether the right that Jones alleges was one that was "clearly established" at the time of the prosecutor's conduct.

Jones' complaint alleges that the prosecutor requested only certain deprivations.  Specifically, it alleges that she requested he be "remove[d] from [the] general population and place[d] in segregation," and that he "not be allowed social visits, telephone calls and that . . . mail be withheld."  Compl. at 1.  At no point does the complaint plausibly allege that the prosecutor requested or even knew of the other alleged conditions, such as the sanitation and shackles and chains or the restrictions on religious exercise.  Jones thus predicates his appeal on his segregation from the general population and his loss of visitation, telephone, and mail privileges.  Aside from a conclusory allegation that he was "being . . .  punished," Compl. at 1, the attachments to Jones' complaint indicate that the prosecutor's requests for the restrictions were motivated by an intent to protect the safety of certain individuals in and outside of the D.C. Jail and to prevent the continued operation of a narcotics trafficking operation from within the D.C. Jail.  *See supra* note 1.  Jones' complaint alleges no facts that would give rise to an inference that this stated purpose was pretextual or that the prosecutor had any other illegitimate purpose for seeking to have him held in a more restrictive environment.  Rather, Jones contends on appeal that as a pretrial detainee he had a substantive due process right

under *Bell v. Wolfish* to be free from restrictive conditions of confinement that were not linked to an institutional purpose and a right under *Sell* to be free from such deprivations by a prosecutor without a prior court order and a heightened showing of necessity.

In *Bell v. Wolfish*, the Supreme Court held that the Due Process Clause protects pretrial detainees "from certain conditions and restrictions." 441 U.S. at 534. The Court instructed that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Id*. at 535; *see also id.* at 537. Observing that such a detainee "has had only a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," *id.* at 536 (internal quotation marks and citation omitted), and a bail hearing when detained for a suspected violation of a federal law, *id.*; *see* 18 U.S.C. §§ 3164, 3148, the Court stated that "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it],'" *id*. at 538 (quoting *Mendoza-Martinez*, 372 U.S. at 567–68). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.[5]

---

[5] The Court noted that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Id*. at 539 n.20.

Conversely, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial

The Court reaffirmed these principles in *Block v. Rutherford*, 468 U.S. 576, 583 (1984), rejecting a constitutional challenge to a blanket prohibition on contact visits and cell searches unobserved by the detainee as reasonably related to the security of that facility and not implicating any "fundamental liberty interests." *Id.* at 597.

Jones' reliance on *Bell v. Wolfish* to demonstrate a "clearly established constitutional right," *Pearson*, 129 S. Ct. at 815, that would prevent the prosecutor from causing a pretrial detainee to be removed from the general population and placed in segregation and denied certain privileges in order to protect individuals in and outside of the detention facility, is misplaced. The substantive due process protections afforded by *Bell v. Wolfish* and its progeny against punishment contemplate that a legitimate government interest may require additional restrictions on pretrial detainees. 441 U.S. at 538–39. Jones' contention that *Bell v. Wolfish* created a right to be subject to restrictive confinement only for a legitimate institutional, as opposed to any non-punitive, interest has no basis in either the text of the opinion or the decisions of those circuit courts of appeal that have considered the question and concluded that imposing restrictions in order to prevent violence outside the prison walls is a legitimate non-punitive interest for purposes of satisfying *Bell v. Wolfish*. *Valdez*, 302 F.3d at 1046–47; *see Love v. Kirk*, 360 F. App'x 651, 654 (7th Cir. 2010). Taking the

---

and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

*Id.*

allegations in Jones' complaint as true, *see Kalina v. Fletcher*, 522 U.S. 118, 122 (1997), provides no basis for a determination that the prosecutor was motivated by the desire to punish Jones. *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1046 (9th Cir. 2002). Looking to public filings and the disclosures by the prosecutor in her letter to Jones' defense counsel, the district court found that the prosecutor had concluded Jones was attempting to continue his illegal drug operation from the D.C. Jail and may have been attempting to identify, locate, and possibly harm persons cooperating with the United States in his prosecution, one of whom was housed at the D.C. Jail. Although Jones was held in a restrictive environment for almost five months, Jones does not allege that the prosecutor's purpose ever changed. No party explains the gap in time between December 5, 2005, when Jones' defense counsel received the prosecutor's letter stating the reasons for the restrictions, and February 26, 2006, when defense counsel filed a motion to modify the conditions, and this delay in seeking post-deprivation relief from the district court accounts for three-fifths of the time Jones was in administrative segregation.

In the absence of factual allegations giving rise to a plausible inference of pretext, the allegations against the prosecutor in Jones' complaint and the attachments supplying the inference that the prosecutor acted to prevent crime and physical harm, must be subject to a Rule 12(b)(6) dismissal to the extent Jones relies on *Bell v. Wolfish*. The right that Jones suggests — a right while in pretrial detention to be free from restrictions that exceed those imposed on the general population, unless the restriction has an institutional as distinct from a prosecutorial purpose or is required by a court order — was not at the time of the prosecutor's actions "clearly established."

Likewise, Jones' contention that *Sell*, 539 U.S. at 181, provides a right to a pre-deprivation hearing at which the

prosecutor bears a heightened burden to demonstrate the need for restrictive conditions fails. Jones' suggestion that the court apply the *Sell* standard is flawed. First, Jones relies on the description of one of the four factors applied in *Sell*, 539 U.S. at 181, and not on the Court's statement regarding the scope of the applicability of the factors. Second, Jones' suggestion of an analogy between the United States' interests in each situation is weak at best. The interest in bringing a psychotic defendant to trial, where the alternative is "lengthy confinement in an institution for the mentally ill . . . that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime," *id.* at 180, is not comparable to decisions regarding conditions of confinement of which dozens if not hundreds may be made in a single facility in a single day and may be exigent when the health and safety is involved. Third, to the extent *Sell* can be interpreted to apply to conditions of pretrial detention beyond medicating incompetent criminal defendants with antipsychotic drugs in order to render them competent to stand trial, such a right was not "clearly established," *Pearson*, 129 S. Ct. at 815, at the time of the prosecutor's actions.

Because Jones fails to show that either a right under *Bell v. Wolfish* to be free from restrictive pretrial confinement except for a strictly institutional, as opposed to a non-punitive governmental purpose, or a right under *Sell* to be free from restrictive pretrial confinement sought by a prosecutor absent a pre-deprivation showing to the district court, was "clearly established," *Pearson*, 129 S. Ct. at 815, at the time of the prosecutor's challenged conduct, and because it is "far from obvious whether in fact there is such a right," *id.* at 818, the court need not decide whether either asserted right exists.

The Supreme Court has instructed that not everything a prosecutor does as part of her duties is protected by absolute

immunity for activities "intimately associated with the judicial phrase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), such that investigative activities normally performed by a detective or police officer are entitled to only qualified immunity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). *See Kalina v. Fletcher*, 522 U.S. 118, 126 (1997); *Atherton*, 567 F.3d at 686. Even assuming a prosecutor's instruction that a pretrial detainee be placed in protective custody to protect witnesses at his criminal trial was entitled to absolute immunity,[6] the prosecutor's instruction that Jones be

---

[6] To the extent that the prosecutor's "requests" to D.C. Jail officials were made for the purpose of protecting witnesses at Jones' trial, the protection of trial witnesses may be a function "intimately associated with the judicial phase of the criminal process," *see Kalina*, 522 U.S. at 125, but a decision that the prosecutor was acting in that capacity would require the resolution of factual inferences in the prosecutor's favor, rather than in Jones' favor as our standard of review requires. That is, the prosecutor informed D.C. Jail officials only that she sought "to ensure the safety of various individuals, and the integrity of the investigation." The detective's affidavit reveals that the lockdown request may have been aimed at preventing Jones from participating in an ongoing narcotics trafficking operation. The prosecutor's letter to Jones' defense counsel indicates that weeks before requesting Jones be placed in lockdown the U.S. Attorney's Office "received information through various channels, including from agents wholly unrelated to this investigation, that [Jones] . . . was attempting to identify witnesses against him and 'take care of them.'" Yet in instructing D.C. Jail officials to place Jones in "lockdown until further notice," the prosecutor stated her purpose was to "ensure the safety of various individuals, several of whom remain unknown to the government." It thus is unclear from the record before this court that trial witnesses and individuals were one and the same, and to the extent Jones was alleged to have threatened individuals other than trial witnesses, protection of them would appear to be an "investigative function[] normally performed by a detective or police officer," *Buckley*, 509 U.S. at 273, and beyond the scope of absolute immunity.

placed in "lockdown until further notice" and his social, telephone, and mail privilege be withdrawn would appear to be in the nature of an administrative function normally performed by correctional officials at the D.C. Jail and as such would be entitled to only qualified immunity. *See Kalina*, 522 U.S. at 126; *Buckley*, 509 U.S. at 273–74. Similarly the prosecutor's formal request for an immediate investigation by the acting warden of why Jones had not been placed in restrictive confinement at the D.C. Jail earlier pursuant to the U.S. Attorney's Office's directions likewise appears to be in the nature of an administrative function entitled to only qualified immunity. Because the prosecutor was, in any event, entitled at least to qualified immunity, however, Jones' claims against the prosecutor were properly dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## B.

To state a claim under section 1983, Jones had to allege facts sufficient to show that the acting warden, acting under color of District of Columbia law, subjected Jones to the deprivation of a constitutional right. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 829 (1985). Although the District of Columbia, as a municipal corporation, is a "person" for purposes of section 1983 liability, because the person sued must have "caused" the deprivation of rights, section 1983 liability cannot rest on a *respondeat superior* theory, whether the person is sued in his official capacity, *see Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978), or in his individual capacity, *Kentucky v. Graham*, 473 U.S. 159, 168 (1985).

Jones failed to allege in his complaint any punitive change to his conditions of confinement by the acting warden or that a District of Columbia government policy or custom caused the

alleged violation of his constitutional rights. *See Monell,* 436 U.S. at 694; *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). He has not alleged that named D.C. Jail officials, much less the acting warden, made or had the responsibility for making the decisions about where he was to be housed in response to the U.S. Attorney's Office's concerns, and so the court need not address whether the complaint stated a plausible claim that the restrictions were excessive in relation to their purpose, given the allegations in the complaint regarding the breadth and duration of the restrictions and the district court's evaluation in April 2006 of what was adequate to address the concerns of the U.S. Attorney's Office. Although detention administrators "are not required to employ the least restrictive means available," *Block*, 468 U.S. at 590 n.10; *see also id.* at 591 n.11, in *Bell v Wolfish* the Supreme Court identified certain limits past which it would be difficult for a court not to conclude a pretrial detainee was being punished when less extreme alternatives were available, 441 U.S. at 539 n.20, *see supra* note 5. Other circuit courts of appeal have suggested that the duration of deprivations, in light of prison policy, may show their punitive nature. *See Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995); *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 991 (3d Cir. 1983). The liability of other D.C. Jail officials not named in Jones' complaint, however, are not before the court in this appeal; nor is the liability of the acting warden under a hypothetical scenario in which he was alleged to be a policymaker or directly involved in the decision to segregate Jones.

Jones contends that certain allegations, including those regarding the squalid and unsanitary conditions and the routine extreme physical restraint necessarily allege a custom or policy. But to survive a motion to dismiss pursuant to Rule 12(b)(6) Jones had to allege "that a District custom or policy caused the claimed violations of his constitutional rights." *Warren*, 353

F.3d at 39; *see City of Oklahoma City*, 471 U.S. at 829. Causation can be shown in several ways, but Jones alleges none. Causation exists if "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional violation.'" *Warren*, 353 F.3d at 39 (quoting *Monell*, 436 U.S. at 694). Jones' complaint does not allege that either the District government or a policymaker in its employ explicitly adopted a policy governing conditions in the S-1 Unit where he was placed in segregation and denied privileges. Causation would also exist if a policymaker "knowingly ignore[d] a practice that was consistent enough to constitute custom." *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). But neither Jones' complaint nor his contentions on appeal identify a policymaker who knew of the conditions in the S-1 Unit and ignored them. Finally, causation may exist if the District government failed to respond "to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Deliberate indifference "is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations," but did not act. *Id.*

> Although [causation] is an objective standard, it involves more than mere negligence. It does not require the District [government] to take reasonable care to discover and prevent constitutional violations. It does mean that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the [District government] may not adopt a policy of inaction.

*Warren*, 353 F.3d at 39.

In *Warren*, the court reversed the dismissal of a complaint because the plaintiff had alleged that "that the District [government] 'knew or should have known' about the ongoing constitutional violations, but did nothing." *Id.* Although Jones' complaint may be read to allege ongoing conditions that were enforced against him and all residents of the S-1 Unit, it does not allege any actual or constructive knowledge by a policymaker. The complaint contains not even a conclusory allegation that anyone other than the corrections officers working in the S-1 Unit were aware of the conditions in the S-1 Unit. The complaint is thus as susceptible to the conclusion that D.C. Jail staff acted without direction in failing to address the conditions in the S-1 Unit as it is to an interpretation that a policymaker was aware of the conditions and chose not to act. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949 (internal citation and quotation marks omitted).

Because Jones' complaint alleges no theory of causation whereby the District government or one of its policymakers caused Jones' alleged constitutional violations, the claims against the acting warden to the extent they were alleged in his official capacity were properly dismissed pursuant to Rule 12(b)(6) for failure to state a claim. Additionally, to the extent Jones has sued the acting warden in his personal capacity, the complaint does not allege any conduct by the acting warden other than his March 1, 2006 memorandum responding to Jones' housing grievance. Although the complaint names others to whom Jones complained about his housing conditions and privilege restrictions, the acting warden is not among them. The acting warden also is not mentioned in connection with the squalid conditions of confinement in the S-1 Unit. Nor did Jones allege any policy or practice whereby the acting warden was the person who made the decisions regarding the conditions

of his confinement. Because the acting warden cannot be held liable pursuant to section 1983 for the conduct of others on a theory of *respondeat superior*, *see Monell*, 436 U.S. at 691; *Graham*, 473 U.S. at 166, and Jones' complaint (and attachments) does not allege or give rise to a plausible inference that the acting warden had any personal involvement in the decision to transfer him to the S-1 Unit from the general population, Jones' complaint fails to state a claim against the acting warden in his personal capacity.

**C.**

Finally, Jones' contention that the district court erred in dismissing his other claims against the detective as conceded is unpersuasive.

On August 27, 2007, the detective who prepared the affidavit in support of the search warrant of Jones' cell at the D.C. Jail on November 23, 2005, filed a motion to dismiss. The District government served the motion on Jones by first-class mail addressed to Jones at the D.C. Jail. On August 30, 2007, the district court issued an order informing Jones of his obligation to file an opposition or other response to the motion to dismiss and warning Jones that if he failed to file an opposition within 30 days the district court may assume the motion is conceded. Jones never filed an opposition, and on January 4, 2008, the district court granted the motion to dismiss as conceded. *See* Order, *Jones v. Lieber*, No. 07-1027 (D.D.C. Jan. 4, 2008), ECF No. 28.

Jones contends for the first time on appeal that he never received the motion to dismiss or the August 30, 2007 order. Issues and legal theories presented for the first time on appeal ordinarily will not be heard on appeal. *See Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010) (citations omitted). This is

especially so where the issue requires the development of new facts on appeal. Jones presents no compelling reason why he could not have raised this issue in the district court in either a motion for reconsideration of the January 4, 2008 order or a motion to vacate and set aside the final judgment of dismissal of March 30, 2009, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Instead Jones maintains that he has presented a plausible case of non-receipt by referencing instances in his other cases where he did not receive court documents. But, unlike those instances, the detective's motion was never returned as undeliverable and Jones had not been transferred from the D.C. Jail where the motion was sent. Jones does not maintain that he did not receive the order dismissing his complaint as to the detective, which also was mailed to him at the D.C. Jail. In any event, Jones might be precluded from claiming now that the detective fabricated parts of the affidavit supporting the search warrant for his jail cell because in his criminal case he filed a motion to suppress the seized materials attacking the sufficiency of the affidavit; the motion was denied and Jones did not appeal the denial. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Maynard*, 615 F.3d 544 (Order Dec. 17, 2010 granting stay of mandate).

Jones' other contention that the dismissal was infirm because the Order failed to specify that the dismissal was without prejudice, is without merit. Rule 41(b) of the Federal Rules of Civil Procedure provides that when a plaintiff fails to prosecute a claim or fails to comply with a court order that a subsequent dismissal for that reason "operates as an adjudication on the merits." The Supreme Court has interpreted this phrase as synonymous with dismissal "with prejudice." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505–06 (2001). Although Rule 41(b) refers to dismissal for these reasons on motion by defendant, "the district court may dismiss [a complaint] on its own motion for want of prosecution or for

failure to comply with a court order." 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2372 (3d ed. 2010); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–30 (1962). Far from causing an infirmity, the district court's failure to act *sua sponte* resulted in the applicability of Rule 41(b)'s "default rule for determining a dismissal's import," *Semtek*, 531 U.S. at 498, whereby an involuntary dismissal pursuant to Rule 41(b) is with prejudice unless otherwise indicated in the dismissal order.

Jones notes that Local Rule 83.23 of the District Court for the District of Columbia requires that an order dismissing a claim for failure to prosecute specify that the dismissal is without prejudice. The district court's order, however, is not for failure to prosecute but for failure to comply with the district court's scheduling order. As a consequence, the local rule is inapplicable.[7]

---

[7] To the extent Jones notes that most jurisdictions allow amendment of a complaint to overcome deficiencies, in this circuit "a request for leave [to amend] must be submitted in the form of a written motion" and the motion must "state with particularity the grounds for seeking the order [and] state the relief sought." *Benoit v. U.S. Dep't of Agric.*, 608 F.3d 17, 21 (D.C. Cir. 2010). Jones did not file a motion for leave to amend, but instead filed this appeal. As a consequence, the district court did not abuse its discretion in failing *sua sponte* to grant leave to amend. Additional contentions raised by Jones in his reply brief are not properly before the court. He contends that: (1) the prosecutor engaged in "outrageous misconduct" in the interrogation of a witness; (2) FBI agents unnamed in the complaint are liable for the search of his jail cell; and (3) the detective listened to Jones' telephone conversations without a warrant. None of these arguments were presented to the district court and they may not be raised for the first time on appeal. Further, because these contentions appear only in Jones' reply brief, and the government has thus been denied an opportunity to respond, the court will not consider them.

Accordingly, we affirm the orders dismissing the claims against the prosecutor and the acting warden for failure to state a claim upon which relief can be granted and the claims against the detective as conceded.

---

*See Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 376 (D.C. Cir. 2010). As these allegations are not included in Jones' complaint, it also is unclear what relevance they have in review of the orders he challenges on appeal.