# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 10, 2012          Decided June 22, 2012

No. 11-7101

RSM PRODUCTION CORPORATION,
APPELLANT

v.

FRESHFIELDS BRUCKHAUS DERINGER US LLP, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00457)

*Daniel L. Abrams* argued the cause for appellant. With him on the briefs was *Kelly Hebron*.

*David W. Ogden* argued the cause for appellees. With him on the brief were *Andrew B. Weissman*, *Joshua M. Salzman*, and *Christina Manfredi McKinley*.

Before: ROGERS and BROWN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: RSM Production Corporation ("RSM") appeals the dismissal of its complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), against the law firm Freshfields Bruckhaus Deringer U.S. LLP, and two of its partners, Jan Paulsson and Brian King (hereinafter "Freshfields"). RSM alleged that Freshfields, through its representation of the nation of Grenada in international arbitration, conspired to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), in an effort to prevent RSM from obtaining an exclusive license for offshore oil and gas exploration and development in Grenada. *See* 18 U.S.C. § 1964(c).[1] The district court ruled that RSM's lawsuit was barred under the doctrine of *res judicata* because of its prior lawsuit in the Southern District of New York regarding the same licensing effort. On appeal, RSM contends Freshfields was not in privity with the New York defendants and that RSM was not required to add Freshfields as a party to that litigation on pain of *res judicata*. Freshfields challenges those arguments and presents alternative grounds for affirmance, upon *de novo* review, which RSM maintains lack merit. We affirm on the alternative ground that RSM's complaint failed to state a claim of RICO conspiracy against Freshfields.[2]

---

[1] 18 U.S.C. § 1964(c) provides, in relevant part:

Any person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

[2] RSM's suggestion that the court should not reach this question because there was a pending motion to amend the complaint at the time of its dismissal, *see* Reply Br. at 15, lacks merit. RSM neither exercised its authority to amend its complaint as of right pursuant to Federal Rule of Civil Procedure 15(a)(1), nor filed "[a]

3

**I.**

Treating the allegations in the complaint as true, as required upon review of a motion to dismiss, *see Atherton v. Dist. of Columbia Office of the Mayor*, 567 F.3d 672, 677 (D.C. Cir. 2009), shows the following:

- In 1996, RSM, a Texas corporation whose chief executive officer is Jack Grynberg, entered into an exclusive agreement with the nation of Grenada that "was to have resulted in an oil and natural gas hydrocarbon exploration, development and production license being issued as a matter of routine performance by Grenada to RSM." Compl. ¶ 10. The agreement provided that the license application was to be filed within ninety days of the agreement's execution, subject, as relevant, to a *force majeure* clause. *See* Agreement Between the Gov't of Grenada & RSM Prod. Corp. ("Agreement"), arts. 3.1, 24, Ex. A to Compl.

- A few months after the Agreement was executed, Gregory Bowen, then Deputy Prime Minister and Minster of Energy of Grenada, Compl. ¶ 5, told Grynberg that "he expected significant bribe payments from RSM and Grynberg in order for RSM and Grynberg to do business in Grenada," *id.* ¶ 12. RSM

_____

motion for leave to file an amended [complaint] . . . accompanied by an original of the proposed pleading as amended," D.C. DIST. CT. LOCAL CIV. R. 7(i). A "bare request in an opposition to a motion to dismiss" is insufficient. *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993). Therefore, at the time of dismissal, RSM had no basis for calling upon the district court's discretion under Rule 15(a)(2). Furthermore, this court may affirm a district court on grounds other than those found by the district court. *See Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008); *Razzoli v. Fed. Bureau of Prisons*, 230 F.3d 371, 376 (D.C. Cir. 2000). See further *Novak v. World Bank*, 703 F.2d 1305, 1309 n.11 (D.C. Cir. 1983).

and Grynberg refused to pay, and Bowen thereafter "obstructed, harassed and intimidated RSM and Grynberg in their efforts to explore, develop and produce Grenada's vast oil and natural gas resources." *Id.*

- Also shortly after the Agreement was executed, RSM, with Grenada's consent, invoked the *force majeure* clause in view of ongoing boundary-water disputes between Grenada and some of its neighbors. *Id.* ¶ 18. Over the course of the next eight years, RSM made substantial expenditures to collect exploration data in reliance on the exclusive licensing Agreement. *Id.* ¶ 19. Also during this time, Lev Model formed Global Petroleum Group, a Grenadian company, in December 2003, to "acquire rights to explore, develop and produce the Grenadian offshore areas believed to contain . . . vast[ ]recoverable reserves of petroleum." *Id.* ¶¶ 14, 17. Model and his company acted as agents for others to bribe Grenadian officials in order to acquire these offshore rights. *Id.* ¶ 17. Then, in January 2004, RSM informed Grenada "that sufficient progress had been made [in resolving the boundary disputes] to allow it to proceed and that it was in the process of revoking the *force majeure*." *Id.* ¶ 20.

- On April 14, 2004, RSM submitted its license application to Grenada. *Id.* ¶ 21. Initially Grenada raised "frivolous concerns" about the lack of financial assurances. *Id.* ¶ 22. Earlier that year a Grenadian official, who reported to Bowen, had informed Global Petroleum's directors (including Model) "that Grenada was 'in a situation' with RSM" and "not in a position to enter any agreements concerning [its] offshore petroleum assets until the 'situation' with RSM was resolved." *Id.* ¶ 23. By letter of April 27, 2004, Bowen advised RSM that its license application was untimely, *id.*, which RSM disputed, *id.* ¶¶ 24, 29. Bowen rejected RSM's efforts to settle the dispute amicably. *Id.* ¶¶ 25–27.

- On or about August 31, 2004, RSM invoked Article 26 of the Agreement by filing a request for arbitration with the International Centre for the Settlement of Investment Disputes ("the ICSID"). *Id.* ¶ 29. Grenada engaged Freshfields as its arbitration counsel. *Id.* ¶ 13. Global Petroleum and Model (and affiliated entities) paid the legal costs of Grenada's arbitration, which amounted to millions of dollars. *Id.* ¶¶ 44–46. In 2009, an ICSID panel ruled that RSM's license submission had been untimely, and RSM appealed. *Id*. ¶ 29.[3]

Meanwhile, on October 31, 2006, RSM sued Global Petroleum, Model, Bowen, and others (including BP, p.l.c. and TNK-BP Ltd., but not Freshfields) in the Southern District of New York, alleging tortious interference with contract and with prospective business advantages and civil conspiracy to commit tortious interference. While that case was pending, and just prior to national elections in July 2008, Grenada granted the exploration and development license to Global Petroleum. *Id.* ¶ 49. The New York complaint was dismissed in 2009, pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6), and the dismissal was affirmed on appeal. *RSM Prod. Corp. v. Fridman*,

---

[3] On March 13, 2009, the ICSID arbitration panel found that Grenada had not breached its contractual obligation to grant a license to RSM because the Agreement had either lapsed on March 28, 2004, when the ninety-day period in Article 3.1 expired and RSM had failed to apply for a license, or terminated upon RSM's receipt of a July 5, 2005 letter from the chief legal officer in the Government of Grenada referencing RSM's breach by untimely filing and stating that in view of RSM's filing for arbitration, "there is no realistic prospect of an amicable resolution" under Article 26.1. *See* ICSID Arbitration Award at ¶¶ 207, 393, 503, Ex. A to Defs.' Mot. to Dismiss Pl.'s Compl. On April 28, 2011, an ICSID review committee discontinued the appellate proceedings and ordered RSM to pay Grenada's appellate costs. ICSID Annulment Proceeding at 20, Ex. A to Defs.' Notice of Supplemental Authority.

643 F. Supp. 2d 382, 390 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72, 75 (2d Cir. 2010) (unpublished).

Prior to the affirmance, RSM filed the current complaint against Freshfields on March 17, 2010, alleging it was part of a conspiracy to bribe Grenadian officials and deny RSM its offshore licensing rights. Specifically, Freshfields "knowingly agreed to perform services of a kind which have facilitated the activities of those who are operating the Enterprise . . . in an illegal manner." Compl. ¶ 56. The Enterprise consisted of Global Petroleum, Model, Bowen, and others who were associated "for the common purpose of enriching Bowen and other high-level Grenadian officials" by "obtaining rights to receive an exclusive [offshore] exploration license" in Grenada, and "defeat[ing] RSM's claim to the very same, exclusive exploration license." *Id.* ¶ 57. The conspiracy had a secondary aim of "conceal[ing] the scheme, since it was and is necessary to avoid detection in order to secure and later retain the license." *Id.* Freshfields, in turn, "by knowingly participating in and benefi[t]ting from the legal fees arising out of the conspiracy, . . . participated in and benefitted from a racketeering enterprise." *Id.* ¶ 62. RSM sought damages in excess of $500 million, costs, attorney's fees, and threefold damages.

Freshfields moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), on four independent grounds: *res judicata*; immunity under the ICSID Convention, arts. 21, 22, *opened for signature* Mar. 18, 1965, 17 U.S.T. 1270, T.I.A.S. No. 6090 (entered into force Oct. 14, 1966); statute of limitations; and, failure to allege facts sufficient to state a RICO claim. The district court dismissed the complaint as barred by *res judicata* in view of the New York lawsuit. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 800 F. Supp. 2d 182, 194 (D.D.C. 2011). RSM appeals, and our review of the dismissal is *de novo*, *see Jones v.*

*Horne*, 634 F.3d 588, 595 (D.C. Cir. 2011); *Atherton*, 567 F.3d at 681; *Ibrahim v. Dist. of Columbia*, 463 F.3d 3, 7 (D.C. Cir. 2006).

## II.

18 U.S.C. § 1962(d) provides that it is "unlawful for any person to conspire" to violate a substantive RICO provision. *See* Compl. ¶ 56. To state a § 1962(d) conspiracy, the complaint must allege that (1) two or more people agreed to commit a subsection (c)[4] offense, and (2) a defendant agreed to further that endeavor. *See Salinas v. United States*, 522 U.S. 52, 65 (1997). A defendant need not agree to be the one to commit the predicate acts. *See id.* at 65–66 (citing ALI MODEL PENAL CODE). Nor must a defendant "participate in the operation or management of [the] enterprise in order to be liable for conspiracy." *United States v. Wilson*, 605 F.3d 985, 1019 (D.C. Cir. 2010). "[I]t suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65; *see also Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). *Salinas* is illustrative. That case involved a scheme in which a federal prisoner housed in a county jail paid the sheriff a fixed monthly rate ($6,000) and a per visit fee ($1,000) for "contact visits" in which he was left

---

[4] 18 U.S.C. § 1962(c) provides that it is:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); Compl. ¶¶ 57–59.

alone with certain women. 522 U.S. at 55. When the sheriff was unavailable, Salinas, "the chief deputy responsible for managing the jail and supervising custody of the prisoners," arranged for the "contact visits" to continue; in return he received "a pair of designer watches and a pickup truck," *id*., thereby demonstrating "that Salinas knew about and agreed to facilitate the scheme," which was sufficient to convict under § 1962(d), *id*. at 66.

"To survive a motion to dismiss, [RSM's] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief [under § 1962(d)] that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[F]acts that are 'merely consistent with' a defendant's liability" and demonstrate only a possibility, but not the plausibility, of relief fail to satisfy this standard. *Id.* RSM's allegations of Freshfields' alleged conspiratorial RICO conduct fall short of this standard. The complaint alleges essentially six facts regarding Freshfields' knowledge. None individually or taken together supports a plausible inference that in agreeing to represent Grenada in international arbitration proceedings, Freshfields knew of the bribery-racketeering conspiracy and agreed to foster its goals.

The complaint alleges:

1. Upon agreeing in 2004 to represent Grenada in international arbitration, Freshfields was on notice that its client "had a reputation for corruption and bribery." Compl. ¶ 50. Such knowledge has no bearing on the contractual defense presented by Freshfields on behalf of Grenada during the arbitration proceedings.

2. "On information and belief," another law firm had declined to represent Grenada after becoming "aware of [the] fact that either Grenada did not have funds adequate to pay [its] bills, or that the arbitration was being funded by a corrupt [e]nterprise," *id.* ¶ 30, and "Freshfields was [] aware . . . that [the other firm] had turned down the representation," *id.* ¶ 50. Another law firm's decision to decline representation, or a client's tainted reputation, is insufficient to show § 1962(d) liability; any other conclusion would preclude an attorney from representing a client alleged to have violated RICO without incurring personal RICO liability even absent evidence of knowledge of the bribery-racketeering conspiracy or of an agreement to further a § 1962(c) offense.

3. Freshfields was on notice that Model "was a convicted felon," Compl. ¶ 50, and that Model and Global Petroleum (and affiliated entities) were financing Grenada's legal defense at arbitration, *id.* ¶¶ 44–46, 50. Such general allegations fall short of supporting a plausible inference that Freshfields was aware of an ongoing bribery-racketeering conspiracy between Grenada and Global Petroleum (and its affiliates) to defeat RSM's attempt to obtain an offshore license. To the contrary, such facts are consistent with a normal business practice in which an interested party — such as Global Petroleum — funds another entity's legal representation. The Model Rules of Professional Conduct indicate that third-party funding is neither unusual nor *per se* impermissible, *see* ABA MODEL RULES OF PROF'L CONDUCT R. 1.8(f) (2011); D.C. DIST. CT. LOCAL CIV. R. 83.15(a) (2012), even if the third-party has a financial interest in the outcome of the litigation, *see* MODEL RULES OF PROF'L CONDUCT R. 1.7. RSM cites no authority to the contrary.

4. Freshfields knew its "retainer was being paid through [the] corrupt relationship," Compl. ¶ 50, and violated

laws of the nations in which it is located by failing to report its arbitration-fee income as "corrupt money," *id.* ¶ 51. For example, in the United Kingdom, "as soon as a lawyer . . . discovers or suspects anything in the proceedings that may facilitate the acquisition, retention, use or control of 'criminal property,' the lawyer must immediately notify the National Criminal Intelligence Service of his belief." *Id.* The complaint, however, does not allege that the funds used to pay Freshfields for its legal services were ill-gotten gains subject to forfeiture or reporting. *See* U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL § 9–120.103 (May 2010).[5] Nor does the complaint identify any "criminal property" in Freshfields' control or possession. The court need not accept conclusions of law — "corrupt money" — as true for purposes of a motion to dismiss. *See Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).

5. In 2007, "public reports" confirmed that Model and another Global Petroleum director had bribed Grenadian officials, thereby putting Freshfields on notice of the bribery-racketeering conspiracy. *See* Compl. ¶ 50.[6] This conclusion

---

[5] *Available at* http://www.justice.gov/usao/eousa/ foia_reading_room/usam/title9/120mcrm.htm (last visited June 11, 2012).

[6] The public nature of other "reports" is unclear. The complaint refers to: (1) a conversation in which a Global Petroleum director told Grynberg that Global Petroleum " 'own[ed]' the Government of Grenada," Compl. ¶ 37; (2) a conversation in which a Grenadian "Ambassador at Large" informed Grynberg that affiliates of Global Petroleum had bribed Grenadian officials in order to "develop the vast petroleum reserves believed to exist in the offshore Grenadian territory," *id.* ¶ 42; and, (3) two declarations dated November and December 2007 by individuals attesting that agents of

assumes facts not alleged. An April 2007 article published by "Forbes" identified Grenada as "one of the best places for embezzled money"; a May 2007 "S&P ratings research comment" mentioned "the 'widespread perception of corruption in the higher echelons of power' in Grenada's th[e]n-existing government"; and a sentencing memorandum described "a Ponzi-scheme run out of a Grenadian [b]ank." *Id.* ¶ 34. Bowen's June 2007 arbitration testimony acknowledged "that Global Petroleum and Grenada had entered into" a funding agreement under which Global Petroleum financed Grenada's defense at arbitration. *Id.* ¶ 44. These allegations are insufficient to establish a plausible inference that Freshfields was aware of anything corrupt relevant to its provision of legal services other than accusations made by and on behalf of Global Petroleum's litigation adversary and general reports of public corruption in Grenada.

6. "[U]pon learning facts suggesting that the source of its income for legal services was also responsible for bribing Grenadian officials for the purpose of obtaining lucrative license rights in Grenada, [Freshfields] could not continue the representation, since the entire representation was and is adverse to its client, Grenada." *Id.* ¶ 52. Further, "representation in the face of a transparent conflict of interest is indicative of [Freshfields'] conscious decision to join the conspiracy, and . . . facilitate the goals of the [RICO] [e]nterprise . . . and conspiracy." *Id.* "[T]he court is 'not bound to accept as true a

---

Global Petroleum bribed Grenadian officials, *id.* ¶¶ 41, 47. Both Grynberg conversations and one of the declarations appear to be public only because RSM referenced the conversations and attached the declaration to its amended complaint in the New York lawsuit, *see* Third Am. Compl. ¶¶ 46, 50, 55, *RSM Prod. Corp. v. Fridman* (No. 06-cv-11512) (Feb. 25, 2008). No allegation indicates how Freshfields would have known of the second declaration.

legal conclusion couched as a factual allegation.' " *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

Taken together, these allegations fail to establish the requisite link for § 1962(d) liability between Freshfields and the bribery-racketeering conspiracy. First, representing Grenada in arbitration by presenting its defense that RSM's license application was untimely under the parties' Agreement, *qua* defense, presents no adversity or conflict of interests as would either inform Freshfields of the bribery-racketeering conspiracy or plausibly show its agreement to present a legal defense was an agreement to further acts of racketeering.

Second, the payment of Freshfields' legal fees by sources seeking the valuable Grenadian offshore license is insufficient to show Freshfields was part of the bribery-racketeering conspiracy. Even when considered in light of the 2007 reports about Grenada and alleged legal malpractice by Freshfields, the source of the fees does not support a plausible inference that Freshfields "was aware of the essential nature and scope of the [RICO] enterprise," *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988)), much less that it "kn[ew] of and agreed to the overall objective of the RICO offense," *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005). The chronology works against RSM. According to the complaint, Freshfields did not begin its representation of Grenada until well after Grenada had denied RSM's license application as untimely and RSM had filed for arbitration. Grenada, represented by Freshfields, defended the denial in the arbitration. Given the success of this defense and its seemingly innocuous, contractual nature, *see* Compl. ¶ 29; ICSID Arbitration Award at ¶¶ 342–95,

it is implausible to infer that the 2007 reports would have alerted Freshfields to a bribery-racketeering conspiracy to deny RSM's license application three years earlier. A more plausible inference is that Freshfields would have suspected that the alleged bribes were made in an effort to secure future licensing rights, not to prompt Grenada's contractually-based denial of RSM's license application. That Freshfields continued to represent Grenada in arbitration after the 2007 publications does not alter the analysis. Because RSM failed to "nudge[] [its] claim[]" that Freshfields knew of the RICO conspiracy or any pattern of racketeering activity "across the line from conceivable to plausible," its "complaint must be dismissed," *Twombly*, 550 U.S. at 570. *See also Iqbal*, 129 S. Ct. at 1951; *Baumer*, 8 F.3d at 1346.

Third, the allegations fail to support a plausible inference that Freshfields agreed to join or acted to foster the bribery-racketeering conspiracy. The complaint does not allege that Freshfields itself committed any of the predicate acts. *See* Compl. ¶¶ 58, 62. Rather, the complaint alleges that Freshfields, "by knowingly participating in and benefit[t]ing from the legal fees arising out of the conspiracy, . . . participated in and benefitted from a racketeering enterprise," *id.* ¶ 62. In other words, to support the necessary inference that Freshfields agreed to further the conspiracy, RSM relies solely on the allegations regarding Freshfields' knowledge of the bribery-racketeering conspiracy and its legal representation of Grenada and payment therefor. Although alleged co-conspirators (*i.e.*, Global Petroleum and Model) provided the funding for Grenada's arbitration defense, it is implausible to infer that therefore Freshfields' provision of legal services at arbitration was intended to further the criminal endeavor. To the contrary, Freshfields' representation of Grenada in the international arbitration proceedings is "more likely explained by," *Iqbal*, 129

14

S. Ct. at 1950, its normal business practice of providing legal services for and representing clients in arbitration.

In sum, the allegations of the complaint target Freshfields' services as attorneys, nothing more. As such, Freshfields' conduct in representing Grenada at arbitration is readily distinguishable from instances in which attorneys have been held liable under RICO § 1962(c) and (d) for performing, under the guise of providing legal services, illegal acts, such as devising a fraudulent scheme to manipulate the bankruptcy process, *see Handeen v. Lemaire*, 112 F.3d 1339, 1350–51 (8th Cir. 1997), or facilitating illegal investments, *see United States v. Loften*, 518 F. Supp. 839, 854 (S.D.N.Y. 1981).[7] Unlike in *Salinas*, 522 U.S. at 66, on which RSM relies, the complaint alleges no conduct by Freshfields beyond the provision of normal legal services in arbitration and so fails to support a reasonable inference that Freshfields "agree[d] to assist others in the commission of unlawful acts," Reply Br. at 24. As explained in *Twombly*, allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well

----

[7] The circuit courts of appeals have declined to extend RICO liability under § 1962(c) to an attorney's provision of routine legal services. *See Walter v. Drayson*, 538 F.3d 1244, 1248–49 (9th Cir. 2008); *Handeen*, 112 F.3d at 1348–49 (8th Cir.); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994); *Baumer*, 8 F.3d at 1344 (9th Cir.); *Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir. 1993); *cf. Reves*, 507 U.S. at 182–83, 185–86. The Eighth Circuit observed in *Handeen* that although "[a]n attorney's license is not an invitation to engage in racketeering" and neither *Reves* nor the RICO statute exempts professionals as a class, "[i]t is a good thing, we are sure, that we find it extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney)." *Handeen*, 112 F.3d at 1349.

explained by legitimate economic incentives, do "not suffice . . . to show illegality." 550 U.S. at 556–57; *see also id.* at 554. So too, unsupported conclusory allegations are "not entitled to be assumed true," *Iqbal*, 129 S. Ct. at 1951, and dismissal is proper when a conspiracy allegation "d[oes] not plausibly suggest an illicit accord because it [i]s not only compatible with, but indeed [i]s more likely explained by, lawful, unchoreographed free-market behavior," *id.* at 1950; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010).

Accordingly, because RSM failed to allege facts sufficient to support a plausible inference that Freshfields knew of and agreed to further the bribery-racketeering conspiracy, the complaint fails to state a claim against Freshfields for RICO civil conspiracy under § 1962(d) and was properly dismissed pursuant to Rule 12(b)(6), and we affirm.