In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2435

JAN DOMANUS, ET AL.,

*Plaintiffs-Appellees*,

*v.*

DEREK LEWICKI, ADAM SWIECH, AND RICHARD SWIECH,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 4922 — **Elaine E. Bucklo**, *Judge*.

ARGUED DECEMBER 4, 2013 — DECIDED FEBRUARY 4, 2014

Before FLAUM, EASTERBROOK, and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Adam Swiech, Richard Swiech, and Derek Lewicki received a host of discovery sanctions in the district court. These sanctions eventually led to the ultimate penalty, when they ended up on the wrong end of a $413,000,000 default judgment. In this appeal, the defendants claim that the district judge abused her discretion both in levying this harsh sanction and in calculating the damages they owe. We disagree, and affirm.

### I. Background

Krakow Business Park sp. z o.o. ("KBP") is a Polish entity that was formed to develop, appropriately enough, a business park near Krakow, Poland. Plaintiffs Jan Domanus and Andrew Kozlowski are shareholders in KBP, and defendants Adam Swiech, his brother Richard Swiech, and Derek Lewicki are all either current or former shareholders. The plaintiffs filed suit[1] against the Swiech brothers and Lewicki in 2008. The plaintiffs also named in the suit several other individuals and entities; default judgment was not entered against them, and that litigation is still pending in the district court.[2] From here on out, we will use "defendants" to refer only to Richard and Adam Swiech and Lewicki. The plaintiffs alleged a fraudulent scheme to loot the company, and sought relief under the civil provisions of RICO, 18 U.S.C. §§ 1962(a)–(d). They also brought supplemental state claims for fraud, conversion, breach of fiduciary duty, tortious interference with prospective business advantage, civil conspiracy, violation of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160/1 *et seq.*, and for an accounting.

Specifically, the plaintiffs contended that the defendants caused KBP to pay out millions of dollars to the defendants for services never performed, and that the defendants stole cash and property from the company. The defendants alleg-

---

[1] Domanus and Kozlowski filed suit on their own behalf and derivatively as shareholders of KBP and several KBP subsidiaries.

[2] These individuals and entities are Katarzyna Szubert-Lewicki, Bozena Sanecka-Swiech, Spectrum, Ltd., Orchard Meadows, LLC, Lake Ridge Townhomes Corp., Lake Ridge, LLC, Polcon Construction Corp., Protorius, Ltd., Saxelby Enterprises, Ltd., and ADR Enterprises, Inc.

edly used some of this money to build subdivisions in suburban Chicago. They put other funds back into KBP as "capital contributions" in exchange for newly-issued stock to Adam Swiech. This new stock diluted the plaintiffs' ownership shares and made Swiech the majority shareholder. Finally, the defendants allegedly sabotaged the sale of KBP's shares to a real estate firm called Orco, and then tried to squeeze the plaintiffs out of the company.

Polish authorities investigated the Swiechs and Lewicki for crimes related to KBP and brought charges against them. Based on the record, that prosecution was seemingly ongoing at the time of default.

Towards the suit's beginning, the defendants unsuccessfully moved to dismiss all claims, and the plaintiffs successfully obtained a preliminary injunction against Adam Swiech. The injunction forbade Swiech from executing several KBP-related transactions. The case was then referred to a magistrate judge for discovery. The defendants' abuse of the discovery process resulted in several sanctions rulings by the magistrate, which we will discuss in detail below. But in short, when the plaintiffs objected to the magistrate's relatively lenient decisions, the district judge found the sanctions too light and imposed more onerous ones—including contempt and an order barring the defendants from using certain evidence.

On October 22, 2012, the plaintiffs moved for default judgment before the district judge. The defendants had not produced the documents that the contempt order required of them. They instead alleged that it was impossible for them to do so. The district judge was unpersuaded, concluding that the defendants had made hardly any effort, let alone ex-

tensive effort, to produce the documents they had been ordered to produce. The district judge granted default judgment against the Swiechs and Lewicki on January 11, 2013, denied defendants' motion for a stay pending resolution of the case against the non-defaulting defendants, and entered final judgment awarding the damages on May 31.

## II. Discussion

The defendants appeal the district judge's imposition of harsher discovery sanctions and her grant of default judgment. The default judgment is what the defendants really care about. But they think they can show that the judgment was unreasonable by showing that the district judge's overruling of the magistrate judge's orders and imposition of harsher sanctions—violations of which drove the eventual entry of default—were an abuse of discretion. The defendants also appeal the district judge's calculation of damages, her denial of their request for a damages hearing, and her denial of a stay pending resolution of the claims against the non-defaulting defendants. We provide the necessary facts as we go.

### A. The discovery sanctions

Section 636 of the Federal Magistrates Act and Federal Rule of Civil Procedure 72(a) govern district court review of nondispositive magistrate judge decisions. 28 U.S.C. § 636(b)(1)(A) (providing that a district judge "may reconsider any pretrial matter … where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law"); Fed. R. Civ. P. 72(a) ("The district judge … must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.") In

short, the district judge reviews magistrate-judge discovery decisions for clear error. *See Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

We, in turn, review all of the district judge's discovery-related sanction decisions only for an abuse of discretion. *Dotson v. Bravo*, 321 F.3d 663, 666 (7th Cir. 2003). "We uphold any exercise of the district court's discretion that could be considered reasonable, even if we might have resolved the question differently." *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003) (citation omitted). The defendants cannot demonstrate that the district court abused that discretion here.

*i. Bank records*

In June of 2010, the plaintiffs sent interrogatories to the defendants to acquire the defendants' bank account records. The defendants failed to comply, prompting the magistrate to grant the plaintiffs a motion to compel. The defendants then produced some records from a handful of accounts. But these records revealed other accounts also controlled by the defendants, which they had not disclosed. The plaintiffs identified eighteen such undisclosed accounts through subpoenas and a tip from Polish prosecutors. They were unable to get records for two of the accounts, which were housed in non-U.S. banks.

1. The Julius Baer account

Adam Swiech owned one of these accounts, a Bank Julius Baer account in Switzerland. This was the account flagged for the plaintiffs by Polish prosecutors, who provided documents showing money flowing into the account from KBP accounts. Through a subpoena, the plaintiffs obtained wire

transfer records from American accounts held by Lewicki that showed additional transfers into the Julius Baer account.

Swiech did not turn over any records, and he refused to acknowledge he owned the account (he claimed it belonged to his minor son). By the end of 2011, Swiech had produced nothing, despite multiple discovery requests, and claimed the records were not within his control.

The magistrate was unconvinced by Swiech's story and ordered production of the records by January 6, 2012. Throughout January and February of 2012, Swiech made a few halfhearted efforts to obtain the records. On January 6, the defendants' counsel sent the plaintiffs a copy of a letter that Swiech supposedly sent to Julius Baer. The letter did not, however, request any specific records or provide an account number or other identifying information. The magistrate judge then instructed Swiech about the form that a proper records request should take—i.e., that the letter should include sufficient identifying information. Swiech sent another letter on January 16, but again failed to include an account number. The defendants' lawyer apparently called Julius Baer on February 2, and was told that an accountholder could acquire information by appearing in person or by requesting it in writing. Still, Swiech produced nothing. Finally, at the end of February, the plaintiffs moved for sanctions and sought to have Swiech held in contempt.

The magistrate found Swiech's behavior sanctionable, but declined to hold him in contempt. Instead, she sanctioned Swiech with a potential adverse jury instruction: if Swiech failed to produce the records by the close of discovery, the jury would be instructed that the records would have been adverse to him.

The plaintiffs objected to this ruling in the district court, and the district judge found the sanction unreasonably lenient in light of Swiech's repeated discovery violations. In an August 13, 2012 order, the district judge held Swiech in contempt, citing a need to leave "escalating sanctions … on the table in order to ensure compliance with court orders." She noted that the magistrate's adverse jury instruction gave Swiech the option of continued delay by allowing him to produce the documents at the close of the discovery—when they would be less useful to the plaintiffs—while still avoiding the sanction. Swiech could also opt not to produce the records at all—say, if they turned out to be very damaging—and live with the adverse instruction.

Swiech argues that the magistrate judge did not clearly err and that it was therefore an abuse of discretion for the district court to hold him in contempt. We disagree. Swiech's efforts to comply with the magistrate's production orders were minimal, at best. He did not disclose the account's existence and then denied owning it. Once he got around to requesting records, he sent patently inadequate letters to Julius Baer that did not comply with the magistrate judge's orders. Indeed, both judges agreed that Swiech had disobeyed several explicit production orders.

Given that, the district judge's decision to stiffen the penalty was sensible. She noted that the records at issue were central to the case (the plaintiffs suspected that the Julius Baer account was a clearinghouse for money being looted from KBP), and that an adverse jury instruction was insufficient impetus for Swiech to comply. She discussed Swiech's history of discovery violations and explained her reasoning for imposing tougher sanctions. Moreover, contempt was a

reasonable sanction. District courts must support a contempt finding with clear and convincing evidence that the court's clear order has been violated. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007). Swiech's overtly noncompliant behavior in response to the magistrate's production orders certainly qualifies. Thus, the district judge's decision to hold Swiech in contempt was not an abuse of discretion.

### 2. The HSBC account

The second controversial account was a Polish HSBC account belonging to Lewicki. Lewicki first claimed the account was irrelevant to the dispute. He then produced an affidavit saying that he was having difficulty getting the records from HSBC. After more back and forth between Lewicki and the magistrate, Lewicki produced only an online transaction log for the account, which contained no details about the wire transfers the plaintiffs were interested in.

The plaintiffs moved to sanction Lewicki at the same time as they did Adam Swiech. Lewicki told the magistrate judge that despite his best efforts, he could do no better than the transaction log. Lewicki's evidence of these efforts consisted of one letter that he sent the bank; a declaration claiming that he called the bank and was told wire transfer records were unavailable and that the bank would not confirm their unavailability in writing; and a flier from HSBC Poland indicating that it would be winding down its banking services in Poland. The magistrate judge had also ordered the defendants' attorney to contact HSBC himself, but he did not do so. Counsel instead submitted a declaration stating that

he "truly and honestly believed" that document production was complete.

Nonetheless, the magistrate judge declined to hold Lewicki in contempt or impose sanctions. The magistrate found Lewicki's efforts more laudable than Adam Swiech's, and concluded that the former had complied with the discovery orders. The district judge disagreed in her August 13 order, however. The district judge found Lewicki incredible and his declaration about his phone call with HSBC insufficient to account for the absence of wire transfer records. Noting Lewicki's history of discovery violations and dishonesty, the court held him in contempt as well.

This order was a dramatic shift from the magistrate judge's response, but that does not mean it was an abuse of discretion. Lewicki's single, apparently unanswered letter to HSBC does not demonstrate a diligent effort at compliance. Moreover, Lewicki's proffered flier from HSBC, which indicated a winding-down of retail banking in Poland, did not suggest that record availability would be compromised in any way.[3]

The district judge's decision to hold Lewicki in contempt was based largely on her finding that Lewicki was not credible. This finding, in turn, was informed by Lewicki's pattern of discovery violations and recalcitrance. We are in no position to question the court's credibility finding—especially

---

[3] The flier indicated that HSBC Poland's Internet banking services would cease after December 31, 2011, but that paper statements would still be available by mail. The flier did not contain any information on the availability of other types of records, such as the wire transfer confirmations sought by the plaintiffs.

where, as here, the court's determination appears reasonable.

The defendants argue that the district court should not have discredited Lewicki's declaration stating that he called the bank and was told wire transfer records were unavailable and that the bank could not provide written confirmation. There was no evidence in the record to rebut the declaration's assertions, the defendants contend, and under the circumstances, Lewicki could do no more than attest to the records being unavailable. But this objection does not explain why the district judge was obligated to credit Lewicki's declaration in the first place. This is especially true because the same declaration contained Lewicki's incredible story about his destruction of Richard Swiech's computer hard drive (more on that below), which cast doubt on the reliability of his entire statement. *Cf. United States v. Terry*, 572 F.3d 430, 434 (7th Cir. 2009) (affording "special deference" to the district court's credibility determinations stemming from testimony at a suppression hearing because of the court's superior ability to evaluate credibility); *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008) (noting, in the immigration context, that a single significant discrepancy was "enough to find petitioners' entire testimony not credible"). Moreover, as the district judge noted, the wire transfer records that the plaintiffs sought were commonly available; at the very least, it should have been possible for Lewicki to provide confirmation from HSBC if the documents were in fact unavailable. Lewicki's claim to the contrary was eminently suspect. In sum, the district judge's credibility determination was not an abuse of discretion.

Once the district judge found Lewicki's testimony incredible, it followed that the magistrate judge had clearly erred by not imposing sanctions. It also meant that there was clear and convincing evidence to support a contempt finding, because what remained was Lewicki's unexcused failure to produce documents after multiple production orders. Thus, the district court's imposition of harsher sanctions was no abuse of discretion.

*ii. The hard drive*

On May 20, 2011, then-counsel for the defendants sent the plaintiffs over 1,800 pages of documents taken from a computer hard drive belonging to Richard Swiech. Counsel told the plaintiffs that the documents had just become available. The plaintiffs reviewed the files and suspected that the production was incomplete, as the documents contained suspiciously few emails between the defendants. The defendants initially denied under-producing, but they eventually admitted that there were additional documents on the hard drive. The magistrate gave the defendants sixty days to review and produce the rest of the documents. None were forthcoming. The defendants eventually produced twenty-one CD-ROM discs near the end of 2011, but the plaintiffs still suspected that the files were incomplete and asked the magistrate to order a forensic inspection of the hard drive on January 12, 2012. Two weeks later, the defendants admitted that the hard drive had been destroyed. Richard Swiech had apparently given it to Lewicki, who said that he had taken the drive apart and given it to his children to play with.

The plaintiffs moved for sanctions in February 2012. In their motion they asked the magistrate judge to bar the defendants from using any of the documents taken from the

hard drive and to order Richard Swiech and Lewicki to obtain the missing emails from their email service providers. The defendants responded with the revelation that the hard drive had allegedly crashed in 2009 and was then destroyed in early 2010. They claimed that Lewicki had used some "special software program" to recover some of the files—the twenty-one CD-ROMs that the defendants had managed to produce—before he destroyed the hard drive. This story did not hold up, however, as the twenty-one discs contained numerous documents from 2010 and 2011—and yet the defendants claimed that the hard drive was destroyed in 2009.

The magistrate judge found that the defendants had violated their duty to preserve evidence, and noted that "much of the Defendants' explanation for discarding the hard drive is incredible." But the magistrate limited sanctions to a jury instruction on spoliation: she found the defendants' behavior was grossly negligent, but not in bad faith.

The plaintiffs again objected to the district court, and the district judge again agreed with them. The district judge pointed out the inconsistencies in the defendants' story. For instance, the defendants' lawyer initially claimed in late 2011 that she believed the hard drive was in Illinois and in working order. Later, when the plaintiffs were seeking to have the hard drive scanned, the defendants changed their story and said that the drive had crashed back in 2009, never to be repaired. This was inconsistent both with the defendants' 2011 claim that the documents "had just become available" and with the documentary evidence they produced—which, if taken at face value, showed that the computer actually was

repaired in 2009.[4] Moreover, the hard drive had been discussed at numerous status conferences, but the defendants had never before indicated that it had been destroyed two years earlier. Taking all this in, the district judge reached the "inescapable conclusion that Defendants destroyed evidence and lied about it." As such, she reasoned that a spoliation instruction was insufficiently harsh. Instead, the district judge forbade the defendants' use of any of the documents taken from the hard drive and ordered the defendants to obtain emails from their email service providers.

The district judge's bad faith finding was reasonable. The defendants' stories regarding the destruction of the computer were far from consistent—both the district judge and the magistrate judge agreed on that point. The defendants can only contend that the magistrate's spoliation sanction was a sufficiently harsh response, and that the district judge abused her discretion by overturning it. But this argument again fails to account for the district court's discretion in this area. The district judge certainly could have upheld the magistrate judge's decision, but that does not mean it was unrea-

---

[4] The evidence produced in support of this 2009 repair is itself hard to decipher. Richard Swiech produced an Apple Store invoice from May 18, 2009, which contained an estimate for a repair service to be performed on Swiech's hard drive. Swiech also produced an Apple Store invoice dated February 22, 2012 (which was in the middle of the discovery dispute); this invoice included a handwritten note indicating that the repair had been done on May 19, 2009. If the note on the second invoice is genuine—the invoice does contain the same repair number as the May 18 receipt—then it undercuts Swiech's claim that his computer was not repaired in 2009. Moreover, Swiech's story is further undermined by the fact that some of the documents produced from the hard drive were from 2010 and 2011, which was after the hard drive's supposed demise.

sonable for her to conclude otherwise. Once the district court concluded that bad faith had driven the defendants' failure to produce the hard drive, it was permissible to infer that the missing evidence would in fact have been harmful to the defendants. *See Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001). Given that, it was no abuse of discretion to grant a harsher sanction barring the use of any documents from the hard drive and ordering Richard Swiech and Lewicki to seek all of their emails from their email providers. Such a sanction appropriately mitigated the harm to the plaintiffs as a result of the defendants' wrongdoing.

*iii. The defendants' deposition-related abuses*

The abuses did not cease after the August 13 order. Additional episodes, while not leading to sanctions, bolstered the case for default. In May 2012, the plaintiffs' attorneys first contacted defendants' counsel about deposing Adam Swiech in Poland.[5] The defendants delayed in scheduling the deposition, claiming that Swiech was having eye surgery in August 2012. Fact discovery ended on September 28, with an exception for the deposition, which the parties agreed to schedule for the week of October 15. But the defendants' attorney rebuffed repeated efforts by plaintiffs' counsel to schedule the deposition. They indicated that Swiech's doctors had restricted his activity. Yet Swiech had testified in a Polish court for over two hours at the end of that same August, just days after his eye surgery was supposed to have taken place.

---

[5] Swiech was apparently forbidden from leaving Poland as the criminal investigation against him continued.

On October 2, the defendants' lawyer sent plaintiffs' counsel an email claiming an inability to schedule the deposition until after Swiech's October 7 doctor's appointment. They never reached out to the plaintiffs after this email, and Swiech was never deposed.

Meanwhile, the defendants deposed plaintiff Domanus on October 23. During his deposition, the defendants' lawyer showed Domanus what was purported to be Domanus's "amended" 2006 tax return. The document had not been produced by either party during discovery, and Domanus stated that he did not recognize it or authorize anyone to prepare it. Upon further inquiry, the plaintiffs discovered that the return had been prepared by the *defendants'* accountant at Richard Swiech's direction. The defendants admitted this, but cryptically explained that the "return" was a "demonstration exhibit."[6]

**B. The default judgment**

This drumbeat of discovery abuse led the district judge to default the defendants.

When the plaintiffs moved for a default judgment on October 22, 2012, the defendants still had not complied with the district judge's August 13 sanctions order related to the bank accounts and hard drive. Neither Adam Swiech nor Lewicki had produced any more bank records. Swiech sent only one additional letter to Julius Baer after the contempt order against him, while Lewicki made no further efforts at all to obtain wire transfer records from HSBC. Similarly, Lewicki

---

[6] The record is not clear about what the defendants hoped to achieve with this "amended" tax return.

had made no effort to retrieve the missing emails. Richard Swiech sought emails from two of his service providers (each of which operated several of his email accounts), but he admitted that he had not reached out to other providers that operated separate accounts, which he had been ordered to do. The two providers that Richard Swiech contacted allegedly told him that they did not keep emails for more than thirty days.

Notwithstanding these demonstrably lackluster attempts, the defendants claimed that it was impossible for them to comply with the discovery orders and that this impossibility should excuse their continued failure to produce. The district judge was unconvinced, finding their efforts inadequate to demonstrate impossibility.

The district judge also noted additional behavior supporting default. For one, she found Adam Swiech's explanation for avoiding his deposition unpersuasive. The only corroboration he offered was his statement, which described a surgery in March 2012 (not August), a hospital stay in July and August, and "sick leave" he took from September 24 to October 7. Swiech also submitted an untranslated document written in Polish that purported to verify the sick leave. But this evidence, even if accepted at face value, could not provide any excuse for Swiech continuing to duck his deposition after October 7.

As for Domanus's "amended" tax return, the district judge concluded that the defendants' explanation that the return was "demonstrative" was incredible, and that even if the court accepted it, the defendants would have still committed a discovery violation by not producing the return ahead of time. Finally, the district court observed that nei-

ther Adam Swiech nor Lewicki paid their contempt fines or the $39,749 in attorneys' fees awarded by the magistrate judge after the imposition of contempt sanctions. The court further noted that the list of the discovery violations she discussed was not exhaustive.

Default judgment is strong medicine for discovery abuse. It is appropriate only where "there is a clear record of delay or contumacious conduct," *Maynard*, 332 F.3d at 467, where "other less drastic sanctions have proven unavailing," *id.*, or where a party displays "willfulness, bad faith, or fault," *In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006). Still, on review of a district court's entry of default, we look to more than just isolated incidents of abuse. "[W]e weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011). We review the district court's grant of default judgment only for an abuse of discretion. *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1322 (7th Cir. 1983).

The defendants correctly argue that they cannot be sanctioned for failure to comply with discovery orders if compliance was impossible. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 210–12 (1958). They claim that the district judge held them to too high a standard for demonstrating impossibility—in her opinion granting the default judgment, she described impossibility as an "exacting legal standard, which requires extensive efforts at compliance undertaken in good faith." The defendants seize on the use of the word "exacting" in advancing this argument.

The problem for the defendants is that there is no dispute that to establish impossibility, one must have made diligent efforts. *See United States v. Conces*, 507 F.3d 1028, 1043 (6th Cir. 2007) (party must show "categorically and in detail" that it took "all reasonable steps within its power to comply with the court's order" (quoting *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991))); *United States v. Santee Sioux Tribe*, 254 F.3d 728, 736 (8th Cir. 2001) (party must demonstrate it "made in good faith all reasonable efforts to comply"). The defendants bear the burden of showing that compliance was impossible. *Santee Sioux Tribe*, 254 F.3d at 736. The defendants even seem to agree that good faith, extensive efforts are required. Their objection is therefore semantic—they seize upon the district court's use of the word "exacting," despite the fact that the court was endorsing the same case that provided the defendants' preferred "good faith" approach. *See Rogers*, 357 U.S. at 209. There is no evidence that the district court was applying a more rigorous standard than it should have, regardless of whether it referenced an "exacting" standard or not.

We find that the district judge's conclusion that the defendants' efforts were neither extensive nor in good faith was entirely reasonable. The defendants made, at most, token efforts to comply with the August 13 contempt order. In the case of Lewicki, there was no effort at all. Their other behavior during discovery bolstered the case for default. For one, Adam Swiech's failure to sit for, or even schedule, his deposition smacked of discovery-dodging. Defendants' production of a conjured "amended" tax return during plaintiff Domanus's deposition was also suspicious. The defendants said that the document was "demonstrative," in an effort to explain why it was not produced during discovery. But the

plaintiffs cast the document in a more sinister light, suggesting that it was prepared as part of a scheme to trip up Domanus at his deposition. Even if the defendants' story is true, the district judge still found that the document should have been produced ahead of time.

Taken together, these discovery abuses form a mosaic that convincingly shows both a "clear record of delay or contumacious conduct," and "willfulness, bad faith, or fault." *Maynard*, 332 F.3d at 462. Moreover, the district judge was clear that her list of abuses was not exhaustive. She also emphasized her adherence to our directive that she consider the defendants' discovery conduct as a whole, and not focus solely on "the straw that broke the camel's back." *e360 Insight*, 658 F.3d at 643. Thus, the district judge's decision to grant the default judgment was warranted and not an abuse of discretion.

**C. The damages calculation**

Judgment secured, the plaintiffs proposed a three-step method for calculating their damages, and offered expert testimony in favor of their theory. The expert first measured the portion of KBP ownership lost as a result of the defendants' diluting the plaintiffs' stake in the company. She termed this amount the plaintiffs' "adjusted KBP ownership percentage"—i.e., what share of the company they would have owned absent the defendants' misdeeds. The expert then multiplied this figure by the price a real-estate firm called Orco had offered to purchase all of KBP's shares to yield the plaintiffs' gross damages. Finally, the expert subtracted the actual value of the plaintiffs' KBP shares to calculate their net damages.

Fixing KBP's present value (from which the plaintiffs' share value was derived) was tricky, because the defendants did not turn over some of the relevant company documents. Thus, the plaintiffs' expert relied on the 2009 offer of another business—Apollo-Rida Poland sp. z o.o.—to buy all of KBP's shares. Finally, because the default judgment had established liability under RICO, the damages were trebled, for a total of just over $413,000,000.

The defendants raised no objection to the plaintiffs' use of "adjusted ownership percentages" as a baseline to measure their damages, and did not question the qualifications of the plaintiffs' expert. Instead, the defendants objected to the use of the Apollo offer to fix KBP's present value and to the certainty of their claimed losses from the Orco deal. The defendants did not offer a damages expert or theory of their own. They moved for an evidentiary hearing to establish damages, but their motion was denied. The district judge acknowledged that the plaintiffs' theory was perhaps speculative, but adopted it anyway, both because the defendants' had put forth no alternative and because she found it was their obstructionist behavior that made business records hard to come by.

We review for an abuse of discretion both the district court's damages award and its decision about the damages hearing. *See BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (noting that plaintiffs have a relaxed burden of proof and broad latitude in quantifying damages); *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009) (review of evidentiary matters is for abuse of discretion only). We do not disturb a damages award accompanying a default judgment unless it is plainly excessive. *Wehrs v.*

*Wells*, 688 F.3d 886, 892 (7th Cir. 2012). That said, while a default judgment conclusively establishes liability, the victor must still prove up damages. Any allegations in the complaint relating to liability are considered true, but allegations going to damages are not. *Id.* But our decisions allow "broad latitude" in quantifying damages, "especially when the defendant's own conduct impedes quantification … [—e]ven speculation has its place in estimating damages." *BCS Servs.*, 637 F.3d at 759. As in any damages calculation, the amount sought must "naturally flow from the injuries pleaded." *Wehrs*, 688 F.3d at 893.

The defendants raise a multitude of arguments attacking the damages award. However, their claims really boil down to this: the damages were not sufficiently certain for the district court to calculate them without holding a hearing. The defendants challenge the certainty of the "adjusted ownership percentages," the accuracy and certainty of the Orco offer used to calculate the gross loss amount, and the reliability of using the Apollo offer to calculate KBP's present value.

Because the defendants did not challenge the plaintiffs' adjusted ownership computations in the district court, they have forfeited their right to do so here. *See, e.g.*, *Hicks v. Avery Drei, LLC*, 654 F.3d 739, 744 (7th Cir. 2011). We therefore review only for plain error, but the defendants could not prevail under an abuse-of-discretion standard, either. Once the defendants were found liable for diluting the stock, the adjusted ownership percentage could be calculated with simple arithmetic.

The defendants did raise complaints about the Orco offer below, but there is nothing to suggest that the district court erred on this front. The defendants contend that Orco's offer

was too high because it did not take into account KBP's considerable debt. But an Orco official, who was deposed in this case, made it clear that Orco was to assume KBP's debts in the deal, meaning that KBP's debt obligations were built into the proposed purchase price. The defendants also claim that because the Orco deal was not final, it was insufficiently definite to support the damages award; Orco could have backed out, leaving the plaintiffs unharmed by the defendants' conduct. But this contention again ignores the testimony of the Orco official, who avowed that the deal would have gone forward as planned if the defendants had not scuttled it. The defendants' blocking the deal was what gave rise to their liability—in other words, through the default judgment, the plaintiffs conclusively established that the deal would have gone off without a hitch but for the defendants. Thus, the plaintiffs have properly proven their gross losses from the Orco deal.

As for the Apollo offer, the plaintiffs admit that it was not the best way to value the company. The offer was four years old, nonbinding, and subject to a slew of conditions. And the plaintiffs' expert acknowledged that a discounted cash-flow analysis would have been the best way to ascertain then-present value. But the documents needed to perform the preferred analysis were unavailable—thanks to the defendants—and the expert thought that the Apollo offer was a sensible alternative. The district judge reasonably found this methodology permissible, especially because the defendants had withheld documents that might have aided in a more accurate valuation. There was no abuse of discretion in adopting any of the inputs in the plaintiffs' damages formula.

Nor did the district court abuse its discretion in denying the defendants a damages hearing. The defendants argue that a hearing was necessary to permit them to question the author of the Apollo offer. They also complain about the offer being four years old. But what the defendants don't dispute—that the Apollo offer was genuine—is key. The Apollo offer was a reasonable way to value the company in the circumstances, and it was a definite figure. The defendants did not submit a damages expert or put forth an alternative damages theory of their own, though they presumably possessed sufficient information to construct one. *See BCS Servs.*, 637 F.3d at 759. The district court had figures in hand. In these circumstances it was no abuse of discretion to decline to hold a damages hearing. *See Dundee*, 722 F.2d at 1323 (noting that a damages hearing is unnecessary when "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits").

**D. The denial of the defendants' motion to stay**

Lastly, the defendants claim that the district court's damages determination should have been stayed until the plaintiffs' claims against the non-defaulting defendants were resolved. We disagree. Though we have in the past prohibited district courts from holding a damages hearing against a defaulting defendant when the same claim remains pending against non-defaulting defendants, this rule comes from concerns of judicial economy and inconsistent damage awards. *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1262 (7th Cir. 1980). There is no concern for inconsistent awards here. The plaintiffs have committed—both in open court and in their briefs—to dismiss all claims against the non-

defaulting defendants if the judgment against the Swiechs and Lewicki is affirmed. Accordingly, they will be judicially estopped from abandoning their firm commitment once we do so. *See, e.g.*, *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 719 F.3d 785, 795 (7th Cir. 2013). This is not the case that *Uranium Antitrust* sought to avoid, and it was therefore no abuse of discretion for the district court to deny the defendants' motion for a stay.

### III. Conclusion

The district court was within its discretion to impose harsh sanctions, to grant a default judgment against the defendants, to calculate the damages as it did, and to decline to hold a damages hearing. We AFFIRM.