**Jan DOMANUS, et al., Plaintiffs–Appellants,**

v.

**LOCKE LORD LLP, et al., Defendants–Appellees.**

No. 15-3647

United States Court of Appeals, Seventh Circuit.

Argued September 8, 2016

Decided January 31, 2017

Robert S. Michaels, Attorney, Alan Francis Curley, Attorney, Robert L. Margolis, Attorney, Robinson, Curley & Clayton, P.C., Chicago, IL, for Plaintiffs–Appellants.

Edward W. Feldman, Attorney, Marc Oliver Beem, Attorney, Kay L. Dawson, Attorney, William J. Katt, Attorney, Miller, Shakman & Beem LLP, Chicago, IL, for Defendants–Appellees Locke Lord LLP, Daniel I. Schlessinger, Martin W. Jaszczuk.

Matthias A. Lydon, Attorney, Matthew Robert Carter, Attorney, Lawrence Desideri, Attorney, Tyler Johannes, Attorney, Winston & Strawn LLP, Chicago, IL, for Defendant–Appellee John A. Dienner, III.

Stephanie Jones, Attorney, James R. Figliulo, Attorney, Figliulo & Silverman, P.C., Chicago, IL, for Defendant–Appellee Kubasiak, Fylstra, Thorpe & Rotunno, P.C.

Before WOOD, Chief Judge, and KANNE and HAMILTON, Circuit Judges.

WOOD, Chief Judge.

If the allegations in the supplemental complaints filed in this case are to be believed, the defendant law firms and lawyers were involved in a hornet's nest of ethical violations. The more difficult question, however, is whether the complaints state claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), commonly known as RICO. Complicating matters is the fact that the alleged RICO violations all relate to a Polish company, Krakow Business Park Sp. z o.o. (Spółka z ograniczoną odpowiedzialnością, which roughly means private limited company), and its affiliates and owners. See *RJR Nabisco, Inc. v. European Community*, —— U.S. ——, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016). The district court concluded, in an exhaustive opinion, that plaintiffs were estopped from asserting certain aspects of their claim and that nothing in the complaint plausibly asserted that the lawyer-defendants (which we will call them unless greater precision is needed) stepped over the line between representation of their clients and participation in a RICO conspiracy. We agree that the complaints do not state any federal claim, and so we affirm the district court's judgment.

## I

This is not the first time this court has encountered the problems of the Krakow Business Park. In *Domanus v. Lewicki*, 742 F.3d 290 (7th Cir. 2014) (*Domanus I*), we addressed a different slice of this litigation: a case brought (as this one is) by Jan Domanus and Andrew Kozlowski, two shareholders in the Business Park, against Adam Swiech, Richard Swiech, and Derek Lewicki, the other major shareholders. *Domanus I* reached us after a certification under Federal Rule of Civil Procedure 54(b) to the effect that the judgment was final, separable from the remainder of the case, and there was no just reason for delaying the appeal. At that time, the Swiechs and Lewicki challenged a default judgment of $413,000,000 that had been entered against them. The default was imposed as a sanction for discovery abuse. The plaintiffs offered evidence showing that they had suffered damages in the amount of $137,800,000. That number was then trebled to $413,000,000 pursuant to 18 U.S.C. § 1964(c).

Critically for the present appeal, the Swiechs and Lewicki argued in *Domanus I* that the district court should have stayed its determination of damages until the plaintiffs' claims against nondefaulting defendants that were not involved in the appeal had been resolved—essentially, that there should have been no Rule 54(b) certification because the judgment was not sufficiently final. We responded as follows:

> Though we have in the past prohibited district courts from holding a damages hearing against a defaulting defendant when the same claim remains pending against non-defaulting defendants, this rule comes from concerns of judicial economy and inconsistent damages awards. *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1262 (7th Cir. 1980). There is no concern for inconsistent awards here. The plaintiffs have committed—both in open court and in their briefs—to dismiss all claims against the nondefaulting defendants if the judgment against the Swiechs and Lewicki is affirmed. Accordingly, they will be judicially estopped from abandoning their firm commitment once we do so. *See, e.g., Grochocinski v. Mayer Brown Rowe & Maw LLP*, 719 F.3d 785, 795 (7th Cir. 2013).

The scope of the judicial estoppel on which we relied is one of the issues in the present appeal.

Before delving much further into the case now before us, it may help to set out the cast of characters, along with the shorthand designations we use in this opinion. The briefs present a bewildering alphabet soup of abbreviations, which we prefer to avoid.

Plaintiffs (collectively Domanus, unless context requires otherwise):

- Jan Domanus, shareholder in Krakow Business Park
- Andrew Kozlowski, shareholder in Krakow Business Park
- Krakow Business Park SP. z o.o. (now in bankruptcy in Poland) and its subsidiaries (*i.e.*, KBP–2 SP. z o.o., etc.), referred to collectively as the Business Park

Original Defendants (collectively the Swiech Group unless context requires otherwise):

- Adam Swiech, shareholder in the Business Park
- Richard Swiech, shareholder in the Business Park
- Derek Lewicki, shareholder in the Business Park

Supplemental Defendants (also referred to as the lawyer-defendants):

- Kubasiak, Fylstra, Thorpe & Rotunno P.C. ("the Kubasiak Firm")
- John Dienner III, a lawyer at the Kubasiak Firm
- Locke Lord, LLP
- Jay Safer, a lawyer with Locke Lord
- Daniel Schlessinger, a lawyer with Locke Lord
- Martin Jaszczuk, a lawyer with Locke Lord

Other Actors:

- Gordon & Karr, LLP, law firm initially representing the Swiech Group, called the Gordon firm
- Richard Karr, lawyer at the Gordon firm
- Janusz Dlugopolski, Polish lawyer for the Business Park, and also for Adam Swiech

At bottom, this litigation involves allegations that beginning in 1997 the Swiech Group undertook an extensive series of actions to loot the Business Park's assets and thus to dilute the value of the firm and, by extension, the shares held by Domanus and Kozlowski. Notably, all of the actions we are about to describe took place near Krakow, Poland. Several large office buildings make up the Business Park, which constructed and managed them. Among other things, the scheme involved tricking the Business Park to enter into sham contracts with members of the Swiech Group or companies they controlled, pursuant to which the Business Park paid for services that were never performed or paid inflated prices for land; causing the Business Park's subsidiaries to lease office-building space at below-market rates to companies the Swiech Group controlled; misappropriating from the Business Park's subsidiaries land worth about $28 million; and demanding and receiving kickbacks from building contractors the Business Park's subsidiaries were using.

Some of the ill-gotten monies the Swiech Group received were then, Domanus asserted, funneled to Chicago-area businesses and properties that the Swiech Group managed. Adam Swiech also reinvested some of the stolen assets into the Business Park, thereby diluting Domanus's and Kozlowski's shares. The Swiech Group also killed a deal with an outside Luxembourgeois firm, Orco, which had agreed to buy all of the Business Park's outstanding shares.

In 2008 Adam Swiech was arrested by the Polish authorities and charged with money laundering, forgery, tax evasion,

and leading an organized crime ring, in connection with his conduct at the Business Park. Although he had to resign from his positions as president and sole management-board member of the Business Park, he allegedly maintained control by appointing family members and friends to key positions in his stead. He was convicted in 2014 on some charges, and apparently others were being prosecuted around the time this case was filed in the district court. Richard Swiech and Lewicki were also criminally charged in Poland for crimes related to the Business Park, but the record does not reflect if or how those charges have been resolved.

All of this led to the lawsuit that came before us in *Domanus I*, and that we are now revisiting. As we noted earlier, in this action Domanus and Kozlowski assert claims under RICO and state law. Their action against the original defendants (the Swiech Group) was resolved by a default judgment, which had been entered as a discovery sanction. We accepted that appeal on the representation that Domanus and Kozlowski would dismiss all claims against the non-defaulting defendants—a group that included Katarzyna Szubert–Lewicki (Lewicki's wife), Bozena Sanecka–Swiech (Richard's wife), and several companies. See *Domanus I*, 742 F.3d at 294 n.2. At that time, neither of the Supplemental Complaints had been filed, and so the Supplemental Defendants had not yet been added to the case.

*Domanus I* did not, however, spell the end to Domanus's efforts to recover for the alleged RICO conspiracy. In August 2014, plaintiffs filed a Supplemental Complaint against Locke Lord and its attorneys, and in November 2014, they added a Second Supplemental Complaint against the Kubasiak firm and Dienner. Both supplemental complaints, it is worth noting, appeared well after February 4, 2014, when this court decided *Domanus I*. In them, plaintiffs accused the lawyers and law firms of facilitating the alleged RICO conspiracy and violating state law by means of ethical violations—principally by simultaneously representing both the Business Park (the actual client) and, surreptitiously, the Swiech Group (the allegedly disloyal insiders).

Although they were recruited by Richard Karr, an attorney at the Gordon firm who was representing the Swiech Group, Dienner and his firm were engaged to represent the Business Park. Domanus accused Dienner (and derivatively the Kubasiak firm) of fraudulent billing practices, through which the Business Park was tricked into paying for the Swiech Group's legal services at a time when it was adverse to their client, the firm. Dienner was also accused of collaborating with the Swiech Group's attorneys on a joint defense, in violation of the "neutrality rule" under which, plaintiffs assert, corporate insiders accused of disloyalty are forbidden from defending themselves at the company's expense.[1] For example, he consulted

---

1. For the sake of argument, we will assume in this appeal that a corporate neutrality rule along the lines described by plaintiffs applied to the defendants. We must note, however, that the scope of such a duty is not defined sharply or universally in American corporate law. For American corporations, such duties are ordinarily a matter for the law of the state of incorporation under the internal affairs doctrine. See generally *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations...."); Restatement (Second) of Conflict of Laws § 309. In this case Polish law would seem to govern such duties for those involved in the Business Park, yet plaintiffs have made no effort to inform us about applicable Polish law. See FED. R. CIV. P. 44.1 (party who intends to raise

with Karr as he prepared a motion to quash service on the Business Park, as he worked on responses to discovery motions, and as he prepared a reply brief. Dienner also allegedly participated in a fraudulent billing scheme, pursuant to which he managed to make the Business Park pay the attorneys' fees for the Swiech Group, who were by then adverse to the company. He did so by concealing the letterhead of the Gordon firm on its bills, by serving as an intermediary between the Business Park and the Gordon firm, and by vaguely referring to work that was actually performed by Karr for the Swiech Group as "additional legal services." Dienner was involved with the case for 14 months—from July 2010 until October 2011, when he and his firm were replaced by Locke Lord.

The latter firm's representation lasted about a year, from May 2011 until May 2012. (There seems to have been some overlap with Dienner at first; we describe the maximum possible time.) Locke Lord initially was asked to represent both the Business Park and the Swiech Group, but it concluded that doing so would raise questions in the Polish prosecutor's mind about Locke Lord's independence. Domanus accuses Locke Lord of accomplishing this joint representation by subterfuge, including by billing for services rendered to benefit the Swiech Group. He also asserts that Locke Lord helped the Swiech Group by attempting to intimidate Kozlowski, by concealing evidence of looting, by concealing evidence of the RICO conspiracy, by providing a defense on the merits through a cross-claim it filed, and by facilitating a fraudulent dilution of the Business Park's shares.

All of the lawyer-defendants moved for dismissal of the claims against them under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motions. It

concluded first that the plaintiffs' agreement to drop all claims against the non-defaulting defendants in *Domanus I* necessarily included an undertaking not to seek the same damages against the supplemental parties, and so they were judicially estopped to the extent that they were still pursuing damages that overlapped with those at issue against the original defendants. Nothing in the commitment they made to this court supported a limitation to parties that were already involved in the lawsuit, as far as the district court could tell. Such an approach would, the court thought, be inconsistent with *In re Uranium* insofar as it would raise the problem of potentially inconsistent damage awards. It recognized, however, that "there may be new 'direct' claims for which damages have not yet been determined," and there are also the derivative claims. It held that neither of those types of claims fell within the judicial estoppel bar.

Nevertheless, the court concluded that the remainder of Domanus's case failed for other reasons. Reviewing both the complaint and the full texts of certain documents central to its allegations, it found nothing indicating that the lawyer-defendants agreed to join the alleged RICO conspiracy. Domanus's only theory under RICO rested on 18 U.S.C. § 1962(d), which requires that the defendant agree to some type of participation in the affairs of a RICO "enterprise" through a pattern of racketeering activity, and that the defendant agree that someone commit at least two predicate acts in furtherance of the conspiracy. (Domanus does not argue that the complaint supports any different RICO claim, and so we do not need to concern ourselves with the fact that plaintiffs are not obliged to plead legal theories.) The requisite knowledge, it concluded, could

issue about a foreign country's law must give written notice).

not come solely from a reading of the various complaints filed in the case, or from the accusations of the Polish prosecutor, because knowledge of accusations is not the same as knowledge that the underlying allegations are true. Neither could Domanus rely on knowledge gained from a huge document-drop of some 60 gigabytes of electronically stored information that the lawyers received, since Domanus acknowledged that the lawyers never meaningfully reviewed those materials. Willful blindness was also out as a theory, the district court thought, because the complaint showed that the lawyers had a sound and straightforward reason for skipping a painstaking review of the documents—cost, plus the idea that a better strategy would be to focus on what the plaintiffs did and what they knew. Overall, the court thought that the lawyer-defendants had done no more than to provide legal services. If they violated the rules of legal ethics in doing so by serving adverse parties (a point the court did not decide), they were subject to discipline, but the court thought that more needed to be shown for a RICO conspiracy.

The court had little to say about several additional defenses raised by the lawyers, including the assertion that RICO does not reach this arrangement, which unfolded in Poland except for the disposition of some of the ill-gotten gains; that the lawyers' actions were immune from civil liability under the *Noerr–Pennington* doctrine, see *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and that the supplemental complaints failed adequately to allege causation. It relinquished jurisdiction over the supplemental state-law claims, see 28 U.S.C. § 1367(c)(3), and otherwise dismissed the case.

# II

■ Before turning to the merits of the appeal, we offer a word about our appellate jurisdiction, which, as in *Domanus I*, depends on a certification under Rule 54(b) and 28 U.S.C. § 1291. In the present case, the district court resolved the claims of all plaintiffs (Domanus, Kozlowski, and the Business Park, realigned as a plaintiff in the bankruptcy proceeding) against the lawyer-defendants. Remaining in the district court is the adjudication of the damages claims the Business Park (with its subsidiaries) has against the Swiech Group (the original defendants). The district court concluded that the latter claims are separate from anything pertaining to the lawyers and that there is no just reason for delay for the present appeal.

■ Under Rule 54(b), when (as here) multiple parties or claims are involved, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Otherwise, the partial resolution of the case must await a true final judgment—one that resolves *all* claims of *all* parties. See generally *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009); *General Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011). It is not enough to resolve something that is designated as a separate claim, if other aspects of the case involve the same underlying subject matter. The claim resolved must dispose of a distinct issue; only then will there be "no just reason for delay" in the appellate process. In hindsight, we wonder whether Rule 54(b) was properly used in *Domanus I*. It is too late now, however, to do anything about that. We are limited to evaluating the propriety of

appellate jurisdiction in the case now before us.

We can immediately set aside two problems that occasionally arise: timeliness and parties. Domanus filed this appeal within 30 days of the district court's Rule 54(b) certification, and there are no claims . of any kind left in the district court against the lawyer-defendants. The difficult issue concerns the relation between these claims and those that the Business Park is attempting to resolve against the original defendants. If the original alleged conspiracy to loot the Business Park is distinct from the allegedly disloyal actions undertaken by the lawyers, then the appeal can go forward. If instead we are looking at one amorphous conspiracy to siphon money from the Business Park whenever, however, and by whomever, then we have a serious finality problem.

The district court understood the supplemental complaints to allege a series of actions undertaken in connection with the legal representation of the Business Park in connection with Domanus and Kozlowski's 2008 RICO lawsuit. These actions, it thought, were qualitatively different from the various ways in which Adam Swiech, Richard Swiech, and Derek Lewicki were allegedly looting the firm and its subsidiaries—the actions at issue under the original complaints, as amended, and the actions that have given rise to criminal proceedings in Poland. The question of the scope of the complaint, it turns out, also has some bearing on our resolution of the merits of the appeal, but there is no avoiding this overlap when we are construing a Rule 54(b) certification.

Although the question is a close one, we conclude that the line drawn by the district court between the conduct at issue in the underlying legal proceedings (the original looting) and the conduct of the Business Park's lawyers offers the best way to understand this case. It is in no one's interest to define the alleged conspiracy so capaciously that it sweeps in conduct unlimited by time, purpose, and actors. We therefore conclude that we do have jurisdiction pursuant to Rule 54(b) and 28 U.S.C. § 1291, and we proceed to the merits.

## III

■ Because the district court dismissed this case for failure to state a claim, we consider the issues *de novo*, accepting as true the factual allegations of the two supplemental complaints, drawing inferences in the plaintiffs' favor, and asking whether they state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). We will focus on Domanus's RICO theory, because if it survives, the supplemental claims will come back into the case, but if it was properly dismissed, then the district court had discretion under the supplemental jurisdiction statute, 28 U.S.C. § 1367(c)(3), to relinquish them. (It appears that there may be citizens of Illinois on both sides of the case, which would explain why there is no allegation of independent jurisdiction over the supplemental claims under the diversity statute, 28 U.S.C. § 1332.)

■ Domanus sued the lawyer-defendants under RICO's conspiracy subsection, which provides in relevant part that:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962. Briefly put, a plaintiff proceeding under subsection (d) must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011). The conspiracy provision is concerned with the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act. *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 731–32 (7th Cir. 1998). Subsection (c) is the relevant substantive provision here; it requires conduct of an enterprise through a pattern of racketeering activity. *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).

Everything hinges on whether, reading the supplemental complaints as favorably to the plaintiffs as we can, they allege that the lawyer-defendants agreed to join the longstanding alleged conspiracy among the Swiech Group to loot the assets of the Business Park and cover up their actions. The first step is to allege that each defendant—that is, the individual lawyers and the two firms—knew about this conspiracy. *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988) (plaintiff must show that a defendant in a RICO conspiracy action "was aware of the essential nature and scope of the enterprise and intended to participate in it.") (internal citation omitted). The district court concluded that the complaints fell short in this respect, even under the generous standard required by Rule 12(b)(6).

There are two ways in which the plaintiffs might have pleaded knowledge: actual knowledge or willful blindness. We consider these in turn.

■ Actual knowledge may be proven either by direct or circumstantial evidence; as we held in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), there is no reason to privilege one type of evidence over another. Circumstantial evidence involves drawing an inference from the circumstances, see *Washington v. LaPorte Cnty. Sheriff's Dept.*, 306 F.3d 515, 519 (7th Cir. 2002). Here, Domanus alleges that Locke Lord was aware of the conspiracy "because Defendants expressly asked them to engage in its core activity: taking money from [the Business Park] on false pretenses and using it to benefit [the Swiech Group], including by perpetuating their control of [the Business Park]." He supports this allegation by reference to the supposedly unsavory billing practices that were used, under which first Dienner, and later the Locke Lord attorneys, tucked services for the Swiechs and Lewicki inside their bills to the Business Park and thereby extracted money from the Business Park for the benefit of the allegedly disloyal individuals.

■ Although a conspirator does not need to know the intricacies and full dimensions of the scheme in order to be liable (or convicted in a criminal case), he must be aware of its essential scope and nature. See *United States v. Volpendesto*, 746 F.3d 273, 285 (7th Cir. 2014). Inappropriate though the billing practices may have been (and, like the district court, we do not need to reach this question), they do not get the plaintiffs where they need to go. Let's assume that the lawyer-defendants should have smelled a rat from Lewicki's comments and the elaborate efforts to conceal the individual bills in their invoices. What kind of rat was it? More

concretely, does their participation or acquiescence in this allegedly shady effort shed any light on whether they personally knew about the sham contracts, the leasing arrangements, and the other fraudulent activity that had occurred years before they were engaged—that is, about the RICO conspiracy that Domanus and Kozlowski, and later the company, originally attacked? Nothing in the complaints supports a conclusion that they had such knowledge. As to the lawyer-defendants, the complaints support only an inference that they misrepresented their failure to observe the alleged ethical restrictions on representing both a victim-corporation and its disloyal insiders under the version of the neutrality rule Domanus asserts is applicable. This is hardly admirable, but it is a far cry from participating in a RICO conspiracy based in Poland.

Domanus also pointed to the allegations in the Third Amended Complaint and certain statements from the Polish prosecutor as sources of the lawyer-defendants' actual knowledge. But, as the district court pointed out, lawyers look at allegations every time they are engaged to respond to a lawsuit. They are not obliged to treat those allegations as true; to the contrary, they recognize that a plaintiff is asserting only that it proposes to prove them, and they evaluate the complaint to see what kind of a defense can be raised. Faced with a similar situation, the D.C. Circuit reached this commonsense conclusion in a case in which the plaintiff alleged that a defendant law firm knew about its client's wrongdoing. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012). There the plaintiff had alleged that the law firm knew about its client's bribery conspiracy from news reports about the bribery and embezzlement scheme, the client's reputation for wrongdoing, and a prior criminal conviction. *Id.* at 1048–50. The court concluded that "[t]hese allegations are insufficient to establish a plausible inference that [the defendant law firm] was aware of anything corrupt relevant to its provision of legal services other than accusations made by and on behalf of Global Petroleum's litigation adversary and general reports of public corruption in Grenada." *Id.* at 1050. The same idea applies here.

Domanus also argues that everything the lawyer-defendants saw, combined with the allegations in the Third Amended Complaint and the prosecutor's statements, made it at least plausible that they actually knew about the conspiracy. We do not doubt that these materials raised a red flag, but that takes us from the realm of actual knowledge to that of willful blindness. The billing scheme and the efforts of the Swiech Group to get their litigation costs paid by the Business Park are troublesome. Nonetheless, the fact that someone should have known about a scheme or fraudulent activity is not enough to show that the person actually knew. See *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870–71 (7th Cir. 2001) (but noting that once the party became suspicious, it took steps to deal with the situation). Here, there are no allegations suggesting that the lawyers knew about the Swiech Group's efforts to loot the business before the time of their engagement, and thus nothing plausibly suggesting that the lawyers joined any conspiracy related to those efforts.

 Willful blindness might be a better theory for the plaintiffs, but it too falls short. An inference of knowledge through willful blindness requires that the defendant "believe that there is a high probability that a fact exists" and "take deliberate actions to avoid learning of that fact." *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, 131 S.Ct. 2060, 179

L.Ed.2d 1167 (2011). Only a subjective belief that there is a high probability that the fact is true, coupled with deliberate steps to avoid learning the fact, is equivalent to knowledge. See *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) ("Neither awareness of *some* probability of illegal conduct nor a showing that the defendant *should* have known is enough" to constitute the legal equivalent of knowledge.).

The key to this argument lies in an email that Jaszczuk (one of the Locke Lord attorneys) sent to his colleagues in the firm, proposing a strategy for the litigation. The email is central to the plaintiffs' claims and was referred to in the supplemental complaints. The district court was therefore entitled to consider it in resolving the motion to dismiss. See *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). In the email, Jaszczuk acknowledged that sifting through the voluminous discovery materials that the firm had received would be time-consuming and extremely expensive. He predicted that the Business Park "simply wouldn't be able to (or wouldn't want to) pay for this type of undertaking." He accepted that if they did undertake such a review, "we might very well learn that certain of the allegations are technically true—i.e. that the transactions did occur and that they weren't entirely above board. But, I also get the feeling that we might find that [plaintiffs] were well aware of what was going on." He suggested that the firm focus on "what the Plaintiffs did and what they knew" when examining the discovery, and leave the rest to the prosecutor.

Taking this favorably to the plaintiffs, this does indicate that Jaszczuk at least suspected that the Swiech Group defendants were up to something shady. What it does not indicate, however, is that he was avoiding the truth because he did not want

to learn the answer. His decision, apparently adopted by Locke Lord, was to skip an exhaustive review of the 60 gigabytes of electronically stored information for the time being in order to save the client money; instead, he proposed what he painted as a more efficient strategy. This is not enough to show willful blindness. Indeed, the email as a whole, which is quoted in the district court's opinion, does not imply that the documents, if read, would reveal evidence of a conspiracy; at most it says that Jaszczuk thought that some transactions "weren't entirely above board." He apparently thought that the plaintiffs might have been part of those deals, which would have put a very different spin on things.

Apart from the supplemental complaints' shortcomings on the subject of knowledge, they are also deficient on the question of agreement—a critical element of a RICO conspiracy case. See *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). We accept that Domanus presented allegations showing that the Swiech Group, with the assistance of its attorney, successfully persuaded first Dienner and then the Locke Lord attorneys to restructure their bills and to coordinate their litigation activities. But the allegations do not tie the story together to show how the lawyer-defendants would have understood these actions (dubious as they may have been, ethically) as an extension or part of the conspiracy to loot the Business Park.

In order to raise an allegation of a conspiracy prohibited by section 1962(d), the plaintiff must allege (1) that the defendant agreed to conduct or participate in the affairs of an "enterprise," and (2) that he agreed to the commission of two predicate acts. *Frost*, 241 F.3d at 869; *Goren*, 156 F.3d at 732. The absence of either of these is fatal to the claim. Formal

agreement is not necessary; when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement. *Kunik v. Racine Cnty.*, 946 F.2d 1574, 1580 (7th Cir. 1991); see *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (circumstantial evidence of anticompetitive agreement must tend to exclude the possibility that the alleged conspirators acted independently). In addition, we bear in mind that mere association with conspirators is not enough to establish an agreement. *Goren*, 156 F.3d at 732. Claims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal representation. See *RSM*, 682 F.3d at 1051–52.

The allegations against the lawyer-defendants are easily explained by their own self-interest: making money and keeping a client happy by avoiding excessive discovery costs. There is no indication that the lawyer-defendants earned any extra money for facilitating the Swiech Group's efforts to have their bills paid by the Business Park, nor that they hatched the plan. But, Domanus insists, the lawyer-defendants were doing more than providing legal representation for their client, because they were simultaneously doing the bidding of their client's adversary. Why would they have done this, without some agreement in place? The short answer is that there may have been some agreement, but it is not one that was ever tied to the RICO conspiracy alleged in the underlying lawsuit.

In the end, as we said in considering our appellate jurisdiction, whatever wrongdoings (if any) that occurred in the course of any of the representation furnished by any of the lawyer-defendants were outside the scope of the RICO conspiracy asserted in

this case. Although the supplemental complaints paint a dismal picture of these attorneys' behavior, assuming the truth of the allegations of disregard for the alleged neutrality principle, misleading billing statements, and the like, these problems must be addressed in a different forum.

■ The lawyer-defendants also have presented a number of alternative arguments in support of the district court's decision. We see no reason to reach them, but we acknowledge them here to confirm that they were properly preserved. First, the lawyer-defendants argue that it is now clear that the conspiracy alleged throughout these proceedings falls outside the territorial scope of RICO, in the wake of *RJR Nabisco, supra.* Questions pertaining to the extraterritorial coverage of statutes normally go to the reach of the statute, not the court's jurisdiction. See *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (securities laws); *Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc) (antitrust). In *RJR Nabisco*, the Court held that RICO's substantive prohibitions can apply extraterritorially, but just insofar as the predicate violations themselves have rebutted the presumption against extraterritoriality. The case before the Court involved 18 U.S.C. § 1962(c); with respect to that subsection, the Court held that there is no private right of action for injuries suffered outside the United States. Importantly for us, the Court expressly declined to reach the question whether the same rule should apply to RICO's conspiracy subsection, § 1962(d), which is the one involved in our case. Because we have resolved the matter before us on other grounds, we are content to leave this for another day, although we suspect that a person asserting a private right under subsection (d) to recover for

foreign injuries may have an uphill battle after *RJR Nabisco.*

We are also disinclined to rest our decision on judicial estoppel, even though we agree with the district court that there is at best a troubling inconsistency between plaintiffs' commitments to this court at the time of *Domanus I* and their present position. Some aspects of the new claim may indeed be estopped, but to the extent that plaintiffs are now complaining about a different alleged conspiracy, the requirements for judicial estoppel might not be met. Rather than untangling all the threads, we elect not to rest on this point. Even under the district court's view, not everything was barred by judicial estoppel, and so it is easier to set this aside.

We express no opinion on the applicability of the *Noerr–Pennington* doctrine to the lawyer-defendants' actions. That doctrine—which initially appeared in the field of antitrust—recognizes that statutes should not be construed to cover the activity of petitioning government, if at all possible. Whether the branch of government is the legislature, the executive, or the courts, the right to present one's viewpoint is protected by the First Amendment. There is a "sham" exception to *Noerr–Pennington,* see *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), but it is difficult to show that litigation is so objectively baseless, or so clearly based on knowing and material falsehoods, that the exception applies. We note only that there are many tools available to discipline lawyers who foment frivolous litigation, and so our decision not to reach this point is of little consequence.

Finally, as we indicated at the outset, the district court has broad discretion over claims brought under its supplemental jurisdiction, 28 U.S.C. § 1367. Typically, when a case is dismissed under Rule 12(b)(6), the district court will relinquish jurisdiction over these claims and allow the state courts (or possibly in this case, the foreign court) to take over if that is proper under their rules. That is the choice the district court made here, and it is one that was comfortably within its discretion.

## IV

No one, least of all the law firms and lawyers involved in these matters, covered himself with glory, accepting for present purposes the allegations in the two supplemental complaints. Nevertheless, we agree with the district court's concluding comment: "Plaintiffs certainly provide a detailed claim of wrongdoing by the attorney defendants, and plaintiffs may not be without recourse. But their path to relief based on these allegations is not through RICO, and thus not in federal court." We AFFIRM the judgment of the district court.